UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| CURTIS TEMPLE,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CLEVE HER MANY HORSES,<br>Superintendent, Pine Ridge Agency,<br>Bureau of Indian Affairs,<br><br>                    Defendant. | CIV. 15-5062-JLV<br><br>ORDER |

**INTRODUCTION**

Before the court is plaintiff Curtis Temple's verified complaint and motion for a temporary restraining order ("TRO").   (Dockets 1 & 5).   Mr. Temple filed an additional affidavit and a memorandum in support of his motion for a TRO. (Dockets 11 & 12).   Defendant Cleve Her Many Horses, the Pine Ridge Agency Superintendent, filed a response and affidavit in opposition to Mr. Temple's motion for a TRO.   (Dockets 13 & 14).   After providing notice to the parties, the court held a hearing on the matter on August 27, 2015.   (Docket 9).   Attorney Terry Pechota appeared on behalf of plaintiff and Assistant United States Attorney Meghan Roche appeared on behalf of defendant.   The August 27 hearing was adjourned due to the parties' ongoing settlement discussions. (Docket 16).   The court reconvened the TRO hearing on August 31, 2015, after receiving notification that the parties did not reach a settlement.   (Docket 18). Both parties submitted post-hearing briefing.   (Dockets 20, 21 & 22).   Both parties submitted additional supplements to the record along with corresponding responses.   (Dockets 24, 24-1, 24-2, 26, 27, 29, 29-1, 29-2, 29-3, 29-4, 31, 34, 38 & 42).

Mr. Her Many Horses subsequently moved for the dismissal of Mr. Temple's complaint on the basis the court is not vested subject matter jurisdiction.   (Dockets 32, 33 & 41).   Mr. Temple opposes the government's motion to dismiss.   (Docket 37).   Mr. Her Many Horses moved for permission to sell the cattle, (Dockets 43, 44 & 45), which Mr. Temple resisted.   (Dockets 46 & 47).   The court held a hearing on February 18, 2016, to consider Mr. Her Many Horses' motion for permission to sell the cattle as well as allegations of the ongoing trespass of Mr. Temple's cattle.

## FINDINGS OF FACT

Mr. Temple is an enrolled member of the Oglala Sioux Tribe and a cattle rancher on the Pine Ridge Indian Reservation.   (Docket 1 at p. 2).   Mr. Her Many Horses is the Superintendent of the Pine Ridge Agency at Pine Ridge, South Dakota.   Id.   In his federal complaint, Mr. Temple asserts that various actions of Mr. Her Many Horses and other tribal actors violated tribal law and wrongfully deprived him of access to grazing permits to range units 169, 501, 505 and P514.[1]   Id. at 2-9.   Mr. Temple's lay tribal advocate, William Bielecki, Sr., testified at the August 31 hearing that Mr. Temple's federal action concerned only range units 501 and 169.   Donald "Duke" Buffington was awarded grazing permits for range units 169 and P501[2] for the five-year period beginning

---

[1]Mr. Temple raises many of the same allegations in his ongoing litigation in tribal court.   See Docket 1-1.

[2]Because the parties referred to range unit "P501" as only "501," the court refers to range unit P501 as "501."

2

November 1, 2012 and ending October 31, 2017.[3]   (Docket 14-4).   Mr. Her
Many Horses testified that although Mr. Buffington's grazing permits became
effective November 1, 2012, they were not signed until March 25, 2013, due to a
lag in completing the paperwork.   See Docket 14-4 at pp. 1, 4, 5 & 8.

On April 27, 2015, Mr. Her Many Horses sent Mr. Temple a letter by
certified mail informing him that following a compliance inspection on April 22,
2015, 36 cows[4] and one bull belonging to Mr. Temple were grazing in trespass on
range unit 169.   (HE 2 at p. 1).[5]   Mr. Her Many Horses' letter apprised Mr.
Temple:

> This letter will serve as your authorization to remove the livestock.
> You have three (3) days to remove the livestock or show why these
> livestock are not trespassing [on] this trust property.   In the event
> these livestock are not removed or other arrangements have been
> made, it will be necessary to assess the penalties as provided [in]
> 25 C.F.R. § 166.800 et al. [sic], and take such other action as may be
> necessary, including the impoundment and sale of the unauthorized
> livestock to prevent continued trespass and to protect Indian Lands.

Id.

Mr. Her Many Horses sent Mr. Temple a second letter by certified mail on
April 27, 2015, informing him that a compliance inspection was conducted on

---

[3]Notwithstanding Mr. Temple's assertions that these grazing permits were
wrongly awarded to Mr. Buffington, Mr. Buffington was and still is the current
holder of the grazing permits for range units 169 and 501.

[4]Because the letter only substantiates 36 cows (20 in one location and 16
in another), the court finds only 36 of Mr. Temple's cattle were in trespass on
range unit 169 as of April 22, 2015.   See id. at 1.

[5]The court references the hearing exhibits as "HE."   The court includes
specific page numbers or section pincites where necessary.

April 22, 2015, on range unit 501 and approximately 202 cows, 2 bulls and 10 horses were found to be in trespass.   Id. at 4.   This letter contained the same warning regarding the potential impoundment of trespassing cattle as identified above.   Id. at 5.

On May 4, 2015, the acting superintendent sent Mr. Temple another letter by certified mail informing him that a compliance inspection was conducted on May 4, 2015, on range unit 169 and approximately 12 cattle and 4 horses were found to be in trespass.   (HE 3 at p. 4).   The acting superintendent advised Mr. Temple:

> You were given the option to remove your livestock or contact my office to show why these livestock had the right to graze upon the property.   You have failed to comply with these instructions.
>
> Your livestock are now in trespass following 166.803 and [you] are liable for the value of products illegally removed plus a penalty of twice the value.   Currently, the value of this trespassing is equal to $416.20.
>
> Your livestock are also subject to be impounded following CFR 25 [sic], part 166.808.   Through this letter you are notified your livestock will be impounded anytime [sic] after (5) five days from the receipt of this notice if they have not been removed from this property.   There will be no further notices.

Id.

The acting superintendent sent Mr. Temple a second letter by certified mail on May 5, 2015, informing him that a compliance inspection was conducted on May 4, 2015, on range unit 501 and approximately 161 cows, 1 bull and 10 horses were found to be in trespass.   Id. at 1.   This letter contained the same

4

warning as the prior May 5, 2015, letter except the value of the trespass was
$3,564.11.   Id. at 2.

On June 5, 2015, Mr. Bielecki, on behalf of Mr. Temple, wrote Mr. Her
Many Horses saying "[a]s you are well aware of, there [have] been several notices
of alleged trespass issued against Mr. Temple respecting range units 169 and
501, as a result of Sandra and Donald 'Duke' Buffington's complaints."   (Docket
15-2 at p. 1).   Mr. Bielecki explained:

> While Mr. Temple will continue to pursue to isolate his cattle onto
> his personally owned and/or leased lands, we are asking that you
> extend further patience with us as we further those pursuits.   We
> are asking that you defer any actions against Mr. Temple regarding
> [the] subject units and trespass pending the outcome of litigation in
> the Tribal courts.

Id. at 2.

On July 2, 2015, Mr. Her Many Horses, responded to Mr. Bielecki's June 5
letter and indicated the United States Department of the Interior, Bureau of
Indian Affairs ("BIA") "intends to proceed with trespassing and impoundment
procedures on Range Units 169 and P501 if the livestock belonging to Mr. Curtis
Temple are not removed."   (Docket 14-3 at p. 1).   Mr. Her Many Horses
continued "Mr. Temple does not have any right to graze his livestock on Range
Unit 169 or Range Unit P501.   Mr. Temple has been contacted about the
trespassing.   Mr. Temple has been notified of our intent to impound his
livestock.   If Mr. Temple refuses to remove his livestock I will have no alternative
but to impound them."   Id. at 2.

On August 12, 2015, Mr. Bielecki received an email from BIA land operations officer Lionel Weston with an attached letter dated August 12, 2015, which Mr. Bielecki summarized as stating that "Mr. Temple had three (3) days to remove his cattle before impoundment would begin . . . ."   (Docket 22-1 at ¶ 10); <u>see</u> <u>also</u> HE 4 at p. 1.

The BIA impounded Mr. Temple's cattle on August 19, 2015.   (HE 4 at p. 1).   A veterinarian and a brand inspector were present during the impoundment process.   <u>Id.</u>   On August 21, 2015, Mr. Her Many Horses informed Mr. Temple by letter that approximately 121 head of Mr. Temple's cattle had been impounded by the BIA.   <u>Id.</u>   The August 21 letter was hand-delivered to Holly Wilson, also a lay tribal advocate of Mr. Temple.   <u>See</u> <u>id.</u> at p. 7; <u>see</u> <u>also</u> Dockets 21 at p. 15 (describing Ms. Wilson as Mr. Temple's lay advocate); 20-1 at ¶ 3 (describing how Ms. Wilson gave Mr. Temple the August 21 letter); 22-1 at ¶ 8 (describing Ms. Wilson's ongoing role in the case).   The letter informed Mr. Temple the "livestock will be sold at the Gordon Livestock Auction Market on September 1, 2015[,] following the regular cattle sale unless redeemed by you prior to the sale."[6]   (HE 4 at p. 1).   Mr. Temple was instructed how to redeem the livestock prior to the public sale.   <u>Id.</u>   The BIA calculated Mr. Temple owed $274,402.46 as a result of the trespass and impoundment.   <u>Id.</u> at 2.

---

[6]The court is aware that the Gordon Livestock Auction Market is located in Gordon, Nebraska.   <u>See</u> Gordon Livestock Market, http://www.gordonlivestock. com.

The parties informed the court the Gordon Livestock Auction Market refused to sell Mr. Temple's cattle because it did not want to be involved in the pending litigation.   On September 3, 2015, the impounded cattle were moved to the Johnson Ranch near Crawford, Nebraska.   (Docket 20-1 at ¶ 5).   The cattle were tested for Trichomonas foetus, the causative agent of Trichomoniasis ("Trich") as part of Nebraska state import regulations.   (Docket 29 at p. 1). Trich is a contagious venereal protozoal disease.   Id.   One of Mr. Temple's bulls tested positive for Trich.   Id.

Dennis Hughes, a Nebraska State Veterinarian and Animal Health Inspector, asserts "[t]he Nebraska Department of Agriculture (NDA) has specific statutory authority to prevent and mitigate introduction of Trichomoniasis into the state."   (Docket 29-2 at p. 1).   Accordingly, the Nebraska Department of Agriculture issued a five-point protocol outlining the process by which Mr. Temple's cattle could be released from quarantine.   (Docket 29-1 at p. 1).   Step one of the protocol calls for the slaughter of the Trich-positive bull "as soon as possible."   Id.   Step five of the protocol opines:

> The easiest and quickest solution to this scenario is to ship the rest of the herd back to South Dakota. Unfortunately, the Trichomoniasis diagnosis and amount of time elapsed means that this group is now considered to be of Nebraska origin, and cannot be imported back into South Dakota legally, without an exception from the South Dakota State Veterinarian, Dr. Dustin Oedekoven.

Id.

Mr. Temple, BIA officials and the legal representatives met on October 14, 2015, to discuss the protocol and related issues.   (Docket 29 at p. 2).   On

October 19, 2015, Mr. Temple, through Mr. Bielecki's affidavit, informed the court that a person at the Johnson Ranch castrated four bulls being held at the ranch due to the Trich quarantine.   (Docket 31-1 at p. 3).   Mr. Bielecki asserted one of Mr. Temple's cows had died and others may be missing.   Id. at 1-4.

On October 26, 2015, Diane Mann-Klager, a natural resources officer at the BIA, clarified that 114 cattle were corralled in the August 19, 2015, impoundment of Mr. Temple's livestock.   (Docket 34-1 at ¶ 3).   Thereafter, 10 additional animals entered the corrals while the brand inspector was working and three animals escaped for a total of 121 animals which were shipped to the Gordon Livestock Auction.[7]   Id.   One cow died along the way, one new calf was born, and the number of impounded bulls remained consistent at three.   Id. Five of the impounded animals belong to Tammy Steel and Trey Temple, Mr. Temple's spouse and son, respectively, who received notice of the sale and have not yet sought the return of their cattle.   Id. at ¶ 7.

On November 4, 2015, Mr. Bielecki, on behalf of Mr. Temple, and Dr. Mendel Miller, a South Dakota assistant state veterinarian, formalized a memorandum of understanding regarding their discussions about the handling of Mr. Temple's cattle.   (Docket 38-2).   On February 2, 2016, Dr. Miller developed a protocol the state of South Dakota recommends for the disposition of Mr. Temple's cattle quarantined in Nebraska as well as for those in South

---

[7]Mr. Temple, through Mr. Bielecki, asserts that the Bank of the West has a priority lien on Mr. Temple's cattle and any proceeds from their sale must be used to first repay Mr. Temple's debt at the Bank of the West, leaving no surplus for Mr. Temple to pay the BIA fines.   (Docket 42-1 at p. 1).

Dakota.   See Docket 49-8.   At least one bull in Mr. Temple's remaining South Dakota herd tested positive for Trich.   Id.   The BIA requests the court's permission to sell the cattle according to its disposition plan, which calls for the immediate sale of the animals subject to the highest risk of spreading Trich and selling approximately 40 of the cattle for eventual slaughter.   See Docket 44 & 44-1.

In matters unrelated to the impounded livestock, the BIA conducted subsequent compliance inspections on range units 169 and 501 on September 9, 2015 and September 16, 2015.   See Docket 24.   As of September 9, 2015, approximately 87 of Mr. Temple's cows and 1 bull were observed trespassing on portions of range unit 501 in which Mr. Temple did not have an ownership interest.   See Docket 24-1 at p. 1.   None of Mr. Temple's livestock were observed trespassing on range unit 169.   Id.   As of September 17, 2015, approximately 81 of Mr. Temple's cows, 4 bulls, 1 steer and 1 horse with a colt were observed trespassing on range unit 501.   See Docket 24-2 at p. 1.   None of Mr. Temple's livestock were observed trespassing on range unit 169.   Id.

On December 4, 2015, approximately 46 cows and one bull were observed trespassing on portions of range unit 501 in which Mr. Temple did not have an ownership interest.   (Docket 44-2 at p. 1).   On the same date, 26 cows were observed trespassing on portions of range unit 169 in which Mr. Temple did not have an ownership interest.   Id.

On February 17, 2016, approximately 21 cows and one bull were observed trespassing on portions of range unit 501 in which Mr. Temple did not have an ownership interest.   (HE 22 at p. 1).   On the same date, 207 cows were observed trespassing on portions of range unit 169 in which Mr. Temple did not have an ownership interest.   Id.

On May 14, 2015, the Oglala Sioux Tribal Court ("Tribal Court") entered an order enjoining all defendants, including the BIA and Mr. Her Many Horses from taking any action related to impounding Mr. Temple's cattle.   (Docket 27-1). On August 3, 2015, the Tribal Court dismissed with prejudice any portion of its May 14, 2015, emergency temporary injunction order enjoining any federal actor.   Id. at 2.   The Tribal Court reasoned that it did "not have jurisdiction over the United States, its agencies, or United States' employees acting in their official capacities like the BIA Superintendent."   Id.   On August 20, 2015, the Supreme Court of the Oglala Sioux Nation affirmed the Tribal Court's dismissal and determined tribal courts "ha[ve] no jurisdiction over the BIA, which is an arm of the federal government."   (Docket 27-2 at p. 1).   The Tribal Court's May 14, 2015, temporary injunction order remains in effect against all tribal entities and officials but not the BIA or Mr. Her Many Horses.   Id.

## MOTION TO DISMISS

The court first considers Mr. Her Many Horses' motion to dismiss.   Mr. Her Many Horses moved to dismiss Mr. Temple's complaint based on a lack of subject matter jurisdiction or alternatively for failure to state a claim under Fed.

R. Civ. P. 12(b)(1) and 12(b)(6), respectively, depending on how the court interpreted the motion.   (Dockets 32 & 33 at p. 1-3).   Mr. Her Many Horses' motion is premised on the same arguments raised in responding to Mr. Temple's motion for a TRO where he asserted the court is not vested with the subject matter jurisdiction necessary to adjudicate the complaint.   See Docket 32 ("This motion is based upon arguments that have already been raised before this Court related to Plaintiff's Motion for a Preliminary Injunction and related post-hearing briefs.").   The court interprets Mr. Her Many Horses' motion to dismiss as having been brought pursuant to Fed. R. Civ. P. 12(b)(1) seeking the dismissal of Mr. Temple's complaint based on a lack of subject matter jurisdiction.

As was made clear in the defendant's motion to dismiss and responses to Mr. Temple's motion for a TRO, Mr. Her Many Horses has mounted a factual attack challenging the court's subject matter jurisdiction to hear Mr. Temple's complaint.   "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'"   Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citing among other cases Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir.), cert. denied, 449 U.S. 953 (1980)).   "A factual attack . . . challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."   Menchaca, 613

F.2d at 511 (citing <u>Mortensen v. First Federal Savings & Loan Ass'n</u>, 549 F.2d

884, 891 (3d Cir. 1977)) (internal quotation marks omitted).[8]

 "In a factual attack, the court considers matters outside the pleadings . . .

and the non-moving party does not have the benefit of 12(b)(6) safeguards."

<u>Osborn</u>, 918 F.2d at 729 n.6 (8th Cir. 1990) (citations omitted).   "Because at

issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power

to hear the case—there is substantial authority that the trial court is free to

weigh the evidence and satisfy itself as to the existence of its power to hear the

case." <u>Id.</u> at 730 (quoting <u>Mortenson</u>, 549 F.2d at 891).   A "district court has

authority to consider matters outside the pleadings when subject matter

jurisdiction is challenged under Rule 12(b)(1)." <u>Id.</u> at 728 n.4 (citing <u>Land v.</u>

<u>Dollar</u>, 330 U.S. 731, 735 n.4 (1947); <u>Satz v. ITT Fin. Corp.</u>, 619 F.2d 738, 742

(8th Cir. 1980)).   Accordingly, the court is free to consider those matters brought

to its attention at the TRO hearings and the parties' subsequent filings in

resolving Mr. Her Many Horses' motion to dismiss.   <u>See</u> <u>supra</u> findings of fact at

p. 2.

## I. Subject Matter Jurisdiction

 "Federal courts are not courts of general jurisdiction and have only the

power that is authorized by Article III of the Constitution and statutes enacted by

---

 [8]In contrast, "[a] 'facial attack' on the complaint requires the court merely
to look and see if plaintiff has sufficiently alleged a basis of subject matter
jurisdiction, and the allegations in his complaint are taken as true for the
purposes of the motion." <u>Menchaca</u>, 613 F.2d at 511 (citations omitted).

Congress pursuant thereto." <u>Winnebago Tribe of Nebraska v. Babbitt</u>, 915 F.
Supp. 157, 162 (D.S.D. 1996) (quoting <u>Marine Equipment Management Co. v.
United States</u>, 4 F.3d 643, 646 (8th Cir. 1993)) (internal quotation marks
omitted).   "The threshold inquiry in every federal case is whether the court has
jurisdiction[,] and the Eighth Circuit has admonished district judges to be
attentive to a satisfaction of jurisdictional requirements in all cases."   <u>Id.</u>
(quoting <u>Rock Island Millwork Co. v. Hedges–Gough Lumber Co.</u>, 337 F.2d 24,
26-27 (8th Cir. 1964) (internal quotation marks omitted).   "The burden of
proving subject matter jurisdiction falls on the plaintiff."   <u>V S Ltd. P'ship v. Dep't
of Hous. & Urban Dev.</u>, 235 F.3d 1109, 1112 (8th Cir. 2000) (citations omitted).

   The United States Supreme Court recognized that "since the jurisdiction of
the court to hear the case may depend . . . upon the decision which it ultimately
reaches on the merits, it is necessary that the plaintiff set out in his complaint
the statutory limitation on which he relies."   <u>Larson v. Domestic and Foreign
Commerce Corp.</u>, 337 U.S. 682, 690 (1949).   Mr. Temple asserts the court is
vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C.
§§ 701-06, 28 U.S.C. § 1361 and 28 U.S.C. § 2201-02.   (Docket 1 at pp. 1-2).
Mr. Her Many Horses "does not disagree that Arising Under jurisdiction
[28 U.S.C. § 1331] generally exists," but argues "[p]laintiff cannot affirmatively
establish a waiver of sovereign immunity under Arising Under jurisdiction."
(Docket 21 at p. 3).

## A.    Pre-impoundment Claims

The court does not have jurisdiction to adjudicate Mr. Temple's claims stemming from the alleged pre-impoundment conduct of Mr. Her Many Horses relating to the allocation of tribal grazing permits.   Mr. Temple's pre-impoundment allegations in his federal complaint mirror his claims pending in Tribal Court.   Compare Docket 1, with Docket 1-1 at pp. 1-22 (Mr. Temple's tribal complaint).   Mr. Temple's allegations surrounding the tribe's grazing permit allocation process underlie his repudiation of the BIA's determination that his cattle were in trespass.   The resolution of Mr. Temple's grazing permit allegations requires interpreting provisions of the Oglala Sioux Tribal Constitution and Oglala Sioux tribal ordinances.   See Docket 1 at pp. 2-9.

"The issue of tribal exhaustion is a threshold one because it determines the appropriate forum."   Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 849 (8th Cir. 2003).   "The tribal exhaustion doctrine is based on "a policy of supporting tribal self-government and self-determination[.]"   Id. (quoting National Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 856 (1985)).   "A federal court should 'stay [ ] its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction.' "   Id. (quoting National Farmers, 471 U.S. at 857).   Tribal exhaustion "favors exhaustion of available remedies in tribal court before a collateral or parallel federal court action may proceed."   Id. (citations omitted).   "Exhaustion is mandatory, however, when a case fits within the policy . . . ."   Id.

14

"Exhaustion is especially appropriate where the dispute arises out of tribal governmental activity."   Wilson v. Bull, No. CIV. 12-5078-JLV, 2014 WL 412328, at *5 (D.S.D. Feb. 3, 2014) (citations omitted).   The court finds the doctrine of tribal exhaustion applies in this case as the resolution of Mr. Temple's pre-impoundment allegations hinge on issues of tribal law and governance and because Mr. Temple's claims are pending in Tribal Court.

### B.     Claims Relating to the BIA's Damage Calculations

Mr. Temple's claims challenging the BIA's assessment of penalties and its cost and damage calculations are not ripe for judicial review as he has not exhausted his administrative remedies.

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.   And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

Hawkes Co. v. United States Army Corps of Engineers, 782 F.3d 994, 999 (8th Cir. 2015) (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)).

If the BIA erred in its penalty assessment or its damage calculation, this is precisely the type of error the agency should be given an opportunity to correct before being hailed into federal court.   See Friends of the Norbeck v. United States Forest Serv., 661 F.3d 969, 974 (8th Cir. 2011).   It is also more efficient for Mr. Temple to take up these disputes directly with the BIA rather than through litigation in federal court.   Id.

Although the BIA's assessment of penalties and cost and damage calculations are included in the amount a trespasser must pay to redeem his livestock, the correction of any such error is best left to the administrative agency specializing in that field.   See, e.g., 25 CFR §§ 166.812-815.   The BIA is equipped to ascertain the value of any destroyed forage or crops or the land's lost value.   This is a different question than determining whether the impoundment of Mr. Temple's livestock violated his due process rights.   See infra.   Mr. Temple also retains the ability to pursue an administrative appeal of the BIA's monetary levies after the livestock are redeemed or sold.   See 25 CFR §§ 166.810, 166.817-819; 25 CFR § 2.7.   The court finds Mr. Temple has not exhausted his administrative remedies in this regard.

### C.   Impoundment Claims

The court next examines whether subject matter jurisdiction exists to resolve Mr. Temple's claims relating to the defendant's impoundment of his cattle.   Integral to the court's analysis is the doctrine of sovereign immunity.

"The waiver of sovereign immunity is a prerequisite to this Court's jurisdiction over the plaintiff's complaint."   Winnebago Tribe, 915 F. Supp. at 163.   "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without consent of Congress."   Id. (quoting Block v. North Dakota, 461 U.S. 273, 287 (1983)) (internal quotation marks omitted).

"The APA waives sovereign immunity for actions against the United States for review of administrative actions that do not seek money damages and provides for judicial review in the federal district courts."   See Middlebrooks v.

United States, 8 F. Supp. 3d 1169, 1174 (D.S.D. 2014) (citing Suburban Mortg.

Assocs., Inc. v. United States Dep't of Hous. & Urban Dev., 480 F.3d 1116, 1122

(Fed. Cir. 2007)).   "Sovereign immunity does not bar a claim which is not

affirmative in nature but rather only requires the defendant officers to cease

unauthorized action."   Coomes v. Adkinson, 414 F. Supp. 975, 982 (D.S.D.

1976) (citing State Highway Commission of Missouri v. Volpe, 479 F.2d 1099,

1123 (8th Cir. 1973)) (further citations omitted).   The Administrative Procedure

Act ("APA") provides:

> A person suffering legal wrong because of agency action, or
> adversely affected or aggrieved by agency action within the meaning
> of a relevant statute, is entitled to judicial review thereof.   An action
> in a court of the United States seeking relief other than money
> damages and stating a claim that an agency or an officer or
> employee thereof acted or failed to act in an official capacity or under
> color of legal authority shall not be dismissed nor relief therein be
> denied on the ground that it is against the United States or that the
> United States is an indispensable party.

5 U.S.C. § 702.

"The APA is not an implied grant of subject-matter jurisdiction permitting

federal judicial review of agency action."   Preferred Risk Mut. Ins. Co. v. United

States, 86 F.3d 789, 792 n.2 (8th Cir. 1996) (citing Califano v. Sanders, 430 U.S.

99, 107 (1977)).[9]   Section 702 of the APA provides judicial review of an agency

_____

[9]To the extent this district previously reasoned the APA is "an independent
jurisdictional grant," Coomes, 414 F. Supp. at 984, the Supreme Court
subsequently determined to the contrary.   Califano, 430 U.S. at 107 ("We thus
conclude that the APA does not afford an implied grant of subject-matter
jurisdiction permitting federal judicial review of agency action.").

action if the person seeking review: (1) identifies some agency action; and (2) shows he has suffered a legal wrong or been adversely affected by that action within the meaning of a relevant statute.   Id. at 792 (citing Lujan v. National Wildlife Fed'n, 497 U.S. 871, 882-83 (1990)).

The United States Court of Appeals for the Eighth Circuit held "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation forms the basis for [the] complaint."   Id. (quoting El Rescate Legal Serv. v. Executive Office of Immigration Review, 959 F.2d 742, 753 (9th Cir. 1991)) (some internal quotation marks and further citations omitted).   "[T]o be 'adversely affected or aggrieved . . . within the meaning' of a statute, the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."   Lujan, 497 U.S. at 883 (quoting Clarke v. Securities Industry Assn., 479 U.S. 388, 396-97 (1987)).

The United States Supreme Court instructs that the "relevant statute" in § 702 be interpreted broadly.   Clarke, 479 U.S. at 396-97 (noting that the Court previously relied on the legislative history of a much later statute rather than the statute alleged to have been violated) (citing Ass'n of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 153 (1970)).   The Supreme Court also acknowledged "the trend is toward enlargement of the class of people who may protest administrative action."   Data Processing, 397 U.S. at 154.   The Data Processing Court characterized the zone of interest test as "whether the

18

interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. at 153.

The zone of interest test must be understood in light of "the presumption in favor of judicial review of agency action." Clarke, 479 U.S. at 399. Accordingly, "[t]he 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." Clarke, 479 U.S. at 399. "The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." Id. at 399-400 (citing Investment Company Institute v. Camp, 401 U.S. 617 (1971)).

The Secretary of the Department of the Interior's ("Secretary") authority to regulate and ultimately impound livestock trespassing on Indian agricultural lands must be viewed in light of the purposes and objectives of the American Indian Agricultural Resource Management Act ("AIARMA") and the United States' trust responsibility owed to Indian tribes and their members. See 25 U.S.C. § 3713. AIARMA charges the Secretary with: (1) "establish[ing] civil penalties for the commission of trespass on Indian agricultural lands"; (2) "designat[ing] responsibility within the Department of the Interior for the detection and

19

investigation of Indian agricultural trespass"; and (3) to "set forth responsibilities and procedures for the assessment and collection of civil penalties."[10]   Id.

The statutory purposes of AIARMA include "carry[ing] out the trust responsibility of the United States" and "tak[ing] part in the management of Indian agricultural lands . . . in a manner consistent with the trust responsibility of the Secretary and with the objectives of the beneficial owners[.]"   25 U.S.C. § 3702.   An objective of AIARMA is "to assist trust and restricted Indian landowners in leasing their agricultural lands . . . consistent with prudent management and conservation practices, and community goals as expressed in the tribal management plans and appropriate tribal ordinances."   25 U.S.C. § 3711(a)(6).   The BIA "has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes[.]"   25 U.S.C. § 3701(2).

The court finds 25 U.S.C. § 3713 conferring power in the Secretary to regulate trespasses on Indian agricultural lands permits judicial review.   Cf. Jones v. Freeman, 400 F.2d 383, 389-90 (8th Cir. 1968) (The Eighth Circuit held the statutes delegating authority to the Secretary of Agriculture to protect the national forests, 16 U.S.C. § 551 and 7 U.S.C. § 1011, permit judicial review.).

The court further finds Mr. Temple's alleged injury, the unconstitutional impoundment of his cattle, to be within the zone of interests protected by the

_____

[10]Following the enactment of the AIARMA, the BIA promulgated regulations governing trespass on Indian agricultural lands.   See 25 CFR §§ 166.800-819.

20

statute.  See Clarke, 479 U.S. at 399-400 ("The test is not meant to be especially demanding . . . ."). Section 3713 and the corresponding regulations, 25 CFR §§ 166.800-819, were enacted with particular purposes and objectives in mind against which the BIA's actions are to be evaluated.  See Coomes, 414 F. Supp. at 986.  Implicit in the Secretary's impoundment regulations is that the owner of alleged trespassing cattle be given adequate procedural safeguards to ensure his cattle are not unlawfully impounded.  Mr. Temple's interest in insuring the impoundment regulations provide adequate safeguards and that the safeguards have been satisfied in his case cannot be denied.  Mr. Temple is an Oglala Sioux tribal member, and the United States owes fiduciary obligations to Indian tribal members in its management of Indian agricultural lands as part of its trust responsibilities.  Id.; see also 25 U.S.C. § 3701(2).

The BIA "does not have despotic power [in dealings with Indians] but is subject to applicable restrictions." Coomes, 414 F. Supp. at 986.  The Oglala Sioux Tribe Supreme Court dismissed Mr. Her Many Horses from Mr. Temple's tribal action, acknowledging that "OST Courts have no jurisdiction over the federal government." (Docket 27-2 at p. 2).  In Mr. Temple's federal case, Mr. Her Many Horses asserts the doctrine of sovereign immunity is jurisdictional in nature so this court also lacks the subject matter jurisdiction necessary to evaluate the lawfulness of the impoundment of Mr. Temple's cattle until after they are sold.  However, the Eighth Circuit when evaluating the impoundment procedures of the National Forest Service held that "[e]ven though the Secretary

acted within his authority in promulgating the regulation, *he has no right to claim sovereign immunity against a landowner who claims improper impoundment*." Jones, 400 F.2d at 389 (emphasis added).

Mr. Her Many Horses next asserts the court lacks jurisdiction over Mr. Temple's complaint because the BIA has not rendered a final decision in the case.   Section 704 of the APA provides "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."   5 U.S.C. § 704.   With regard to the interplay between § 702 and § 704 of the APA, the Eighth Circuit previously rejected the Secretary of the Department of the Interior's contention that § 702 "exists only to allow [judicial] review of a final agency decision."   See Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 475 (8th Cir. 1988).

The court in Red Lake held that "the waiver of sovereign immunity contained in section 702 is not dependent on the application of the procedures and review standards of the APA.   It is dependent on the suit against the government being one for non-monetary relief."   Id. at 476; see also Muniz-Muniz v. United States Border Patrol, 741 F.3d 668, 673 (6th Cir. 2013) (collecting cases) (noting that "[o]ther circuits . . . are unanimous in their conclusion that a plaintiff who seeks non-monetary relief against the United States need not also satisfy the requirements of § 704 of the APA before there is a waiver of sovereign immunity."); Delano Farms Co. v. California Table Grape Comm'n, 655 F.3d 1337, 1344 (Fed. Cir. 2011) (holding that "section 702 of the

22

APA waives sovereign immunity for non-monetary claims against federal agencies . . . . It is not limited to 'agency action' or 'final agency action,' as those terms are defined in the APA.").

"[S]ection 704's 'final agency action' requirement only limit[s] the viability of claims made under the APA, and because section 702 operate[s] as a waiver for all nonmonetary claims, including those claims *not* made under the APA, section 704 did not limit section 702's waiver of sovereign immunity." Treasurer of New Jersey v. United States Dep't of Treasury, 684 F.3d 382, 398 (3d Cir. 2012); see also Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 187 (D.C. Cir. 2006) (holding that § 702's waiver of sovereign immunity "applies regardless of whether the [agency's] press release constitutes 'final agency action.'"); Winnebago Tribe, 915 F. Supp. at 165 ("The waiver of sovereign immunity in § 702 is not limited to suits brought under the APA.").   Here, Mr. Temple does not seek money damages but rather only that his impounded cattle be returned to him.

The court finds the defendant has waived sovereign immunity and that it is vested with subject matter jurisdiction to adjudicate Mr. Temple's Fifth Amendment due process claims relating to the impoundment of his cattle under 28 U.S.C. § 1331.   See Coomes, 414 F. Supp. at 983 ("Consequently, since plaintiffs do not ask [for] money damages and, given finality, the government expressly consents to suit, there appears no reason pertaining to sovereign immunity why this Court should not proceed to consider the plaintiffs' claims."). Mr. Temple adequately alleged Mr. Her Many Horses took his cattle without due

process of law in violation of the Fifth Amendment of the Constitution.
Furthermore, Mr. Temple's "due process claim . . . [also] invokes the power of the
federal courts to grant injunctive relief against a department of the executive
branch of the federal government." Id.

With regard to Mr. Temple's administrative claim relating to the
impoundment of his cattle, Mr. Her Many Horses asserts the BIA's decision does
not become final and Mr. Temple's appeal rights do not vest until Mr. Temple
redeems his cattle.   (Docket 21 at p. 18).

> As a general matter, two conditions must be satisfied for agency
> action to be "final": First, the action must mark the consummation
> of the agency's decisionmaking process—it must not be of a merely
> tentative or interlocutory nature.   And second, the action must be
> one by which rights or obligations have been determined, or from
> which legal consequences will flow.

Hawkes Co. v. United States Army Corps of Engineers, 782 F.3d 994, 999 (8th
Cir. 2015) (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)).

For all practical purposes, once Mr. Temple's cattle are sold they are gone
and all may be slaughtered.   (Docket 44-1).   Mr. Temple is a cattle rancher who
derives his livelihood based on his ability to maintain and grow his cattle herd.
Because Mr. Temple's cattle are now considered be a part of a Trich infested
herd, approximately 40 of the cattle will be sold for immediate or near-immediate
slaughter and approximately 67 will be sold with the disclosure that they come
from a Trich infested herd, causing the cattle to be marketed and sold at a much
lower sale price than normal.   See Docket 44-1.   Approximately 20 will be sold
without restriction.   Id.   A potential action challenging the BIA's damage

24

calculation and penalty assessment is a small consolation to Mr. Temple who is facing the economic realities of the destruction of a cattle herd that took years to build, especially when the location at which the herd contracted Trich cannot yet be accurately determined.[11]

Even if the impoundment is subsequently determined to be unlawful, Mr. Temple will have lost not only those cattle but also any offspring they could have generated and will receive abnormally low recompense due to the Trich infestation.   The legal and economic consequences from the sale of the cattle will fall immediately on Mr. Temple, not months or years later after the adjudication of a subsequent damages claim.   See State of S.D. v. Andrus, 614 F.2d 1190, 1195 n.1 (8th Cir. 1980) (citing McKart v. United States, 395 U.S. 185 (1969) ("The doctrine of exhaustion of administrative remedies is not a strict jurisdictional requirement, but rather a flexible concept which must be tailored to the circumstances of the particular case.").

Notwithstanding Mr. Temple's subsequent legal remedy challenging the validity of the BIA's damage calculation, under the unique facts of this case, the

---

[11]Counsel for Mr. Her Many Horses asserts Mr. Temple's herd contracted Trich prior to their impoundment, while counsel for Mr. Temple asserts the cattle contracted Trich after impoundment.   Counsel for Mr. Temple also points out that the BIA illegally exported the cattle to Nebraska by failing to follow the Nebraska Trich import requirements.   (HE 8).   Regardless, approximately 107 of the 127 cattle identified in Mr. Her Many Horses' disposition plan will be marketed and sold at significantly reduced prices due to the Trich infestation. The court also received testimony that because the cattle have been in Nebraska for over 30 days, only certain of the cattle—for specific purposes, namely entering the human food chain—can be brought back into the state of South Dakota.

sale of Mr. Temple's impounded cattle marks the culmination of the BIA's impoundment proceedings.   The result of which is Mr. Temple no longer owning the livestock and, in this case, many of the livestock being slaughtered.   Mr. Her Many Horses' actions in impounding Mr. Temple's livestock constitute a final agency action permitting judicial review.   See Jones, 400 F.2d at 390 (granting judicial review following the impoundment of livestock).

The rationale underlying administrative exhaustion favors the court's review of Mr. Temple's impoundment claims.   Should Mr. Her Many Horses or the Tribal Courts subsequently determine Mr. Temple's cattle were wrongfully impounded, the BIA's ability to correct its mistake is necessarily limited as the cattle already will have been sold or slaughtered.   Friends of the Norbeck, 661 F.3d at 974.   To the extent ancillary litigation can be avoided, efficiency also favors addressing Mr. Temple's impoundment claims prior to the sale of the cattle.   Id.; cf. Coomes, 414 F. Supp. at 988 (finding the BIA's decision to be final despite plaintiffs not having fully exhausted their administrative remedies).

The court finds it is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1331 to adjudicate Mr. Temple's APA claim stemming from the impoundment of his cattle.[12]   See Goodface v. Grassrope, 708 F.2d 335, 338 (8th Cir. 1983) (holding § 1331 "confers general jurisdiction on federal courts to review federal agency actions subject only to preclusion-of-review statutes.   We

---

[12]The court notes Mr. Her Many Horses stipulated that jurisdiction exists under § 1331.   Because the court determined subject matter jurisdiction exists under § 1331, it need not examine the issue of subject matter jurisdiction under Mr. Temple's other asserted bases, 28 U.S.C. §§ 1361 and 2201-02.

know of no statute precluding judicial review of BIA actions . . . .") (internal quotation marks omitted); see also Coomes, 414 F. Supp. at 983.   The court denies Mr. Her Many Horses' Rule 12(b)(1) motion to dismiss to the extent it seeks to dismiss Mr. Temple's Fifth Amendment due process claims and APA claim relating to the impoundment of his livestock.

Having determined the defendant waived sovereign immunity, the court need not analyze whether Mr. Her Many Horses' actions constitute ultra vires conduct such that his actions would be excepted from the protection of sovereign immunity.   See, e.g., Muirhead v. Mecham, 427 F.3d 14, 18 (1st Cir. 2005) (The court first considered whether there had been a waiver of sovereign immunity before analyzing whether there was an exception to the sovereign immunity doctrine.); see also Larson, 337 U.S. at 689-90 (outlining the test to determine whether a federal officer's actions are excepted from the protection of sovereign immunity); Johnson v. Mathews, 539 F.2d 1111, 1124 (8th Cir. 1976) (same). The court next examines the merits of Mr. Temple's impoundment claims in light of his motion for a TRO.

## TRO CONCLUSIONS OF LAW

A preliminary injunction is an extraordinary remedy, and the burden is on the movant to show relief should issue.   Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted).   The district court has sound discretion to grant or deny such relief.   Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 n.8 (8th Cir. 1981) (en banc).   When ruling on a motion for a

27

temporary restraining order or preliminary injunction the court must consider: "(1) the threat of irreparable harm to the moving party; (2) the balance of this harm with any injury a preliminary injunction would inflict on other parties; (3) the likelihood of success on the merits; and (4) the public interest." Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Daugaard, 799 F. Supp. 2d 1048, 1053 (D.S.D. 2011) (citing Dataphase, 640 F.2d at 113).

"[W]hen weighing these factors to determine whether the extraordinary relief of a preliminary injunction should be granted—no single factor is in itself dispositive." National Wildlife Federation v. Harvey, 440 F. Supp. 2d 940, 958 (E.D. Ark. 2006) (citing Calvin Klein Cosmetics v. Parfums de Coeur, Ltd., 824 F.2d 665, 667 (8th Cir. 1987)). "All of the factors must be considered to determine whether the balance weighs towards granting the injunction." National Wildlife Federation, 440 F. Supp. 2d at 958 (citing Dakota Industries, Inc. v. Dakota Sportswear, Inc., 988 F.2d 61, 64 (8th Cir. 1993)). In deciding whether to grant a preliminary injunction, 'likelihood of success on the merits is most significant.'" Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995) (quoting S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir.), cert. denied, 506 U.S. 863 (1992)); see also Chicago Stadium Corp. v. Scallen, 530 F.2d 204, 206 (8th Cir. 1976) ("The two most critical factors for a district court to consider in determining whether to grant a preliminary injunction are (1) the probability that plaintiff will succeed on the merits and (2) whether the plaintiff will suffer irreparable harm if an injunction is

28

not granted."). "A plaintiff is required to make only a prima facie showing that there has been an invasion of its rights and that a preliminary injunction is essential to the assertion and preservation of those rights." Livestock Mktg. Ass'n v. U.S. Dep't of Agric., 132 F. Supp. 2d 817, 824 (D.S.D. 2001) (citations omitted). The court addresses each factor separately.

## I. Likelihood of Success on the Merits

### A. Appropriate Standard

Mr. Temple seeks to enjoin the actions of Mr. Her Many Horses which were carried out pursuant to the BIA's regulatory procedure found in 25 CFR §§ 166.800-819. A party seeking to enjoin government action based on a presumptively reasoned democratic process must make a threshold showing that it is "likely to prevail on the merits." Planned Parenthood, 530 F.3d at 733. The Eighth Circuit reasoned this "more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.' "[13] Id. at 732 (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam).

After noting that only a state statute was before it in Planned Parenthood, the Eighth Circuit endorsed the Second Circuit's analysis in determining "to what extent the challenged action represents 'the full play of the democratic

---

[13]The Planned Parenthood court noted that district courts should employ "the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes." Id.

process[,]' " in cases where a preliminary injunction is sought to enjoin federal administrative action.   Id. at n.6. (quoting Able, 44 F.3d at 131-32).   In Able, the Second Circuit determined the legislation implementing the Department of Defense's "Don't Ask, Don't Tell" policy was in the public interest and a suit seeking to enjoin the resulting investigations and discharge proceedings required plaintiffs to satisfy the higher likelihood of success standard.   See Able, 44 F.3d at 130-33.   The Second Circuit reasoned:

> [W]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.

Id. at 131 (internal quotation marks omitted) (quoting Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989).

The Able court concluded:

> [W]here the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations, [its] role in reviewing that determination for the purpose of deciding whether to apply the "serious questions" or "likelihood of success" standard is severely limited."

Id.

The administrative action Mr. Temple seeks to enjoin involved the full play of the democratic process, and he is required to satisfy the more rigorous "likely to prevail on the merits" standard.   Congress delegated authority to the Secretary to regulate trespasses on Indian agricultural lands.   25 U.S.C. § 3713.

The purpose of the statute is for the United States to carry out its trust responsibility in the management of Indian lands for the benefit of Indian peoples and for the preservation of Indian agricultural lands.   See 25 U.S.C. §§ 3701-02. The trespass regulations at issue were properly enacted to implement this grant of authority.   The actions challenged by Mr. Temple received "the full play of the democratic process" and his motion to enjoin those actions requires him to show that he is likely to prevail on the merits of his claims.

### B.   Fifth Amendment Due Process Claims

Mr. Temple asserts the impoundment of his cattle violates his Fifth Amendment due process rights.   "[D]ue process . . . is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather is "flexible and calls for such procedural protections as the particular situation demands."   Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (internal quotation marks and citations omitted).   In determining whether Mr. Temple's due process rights were violated, the court weighs (1) "the importance of the private interest and the length or finality of the deprivation"; (2) "the likelihood of governmental error"; and (3) "the magnitude of the governmental interests involved."   Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982); see also Mathews, 424 U.S. at 335.   The court is mindful that "the root requirement of the Due Process Clause" is that "an individual be given an opportunity for a hearing before he is deprived of any significant property interest."   Cleveland Bd. of Educ. v. Loudermill, 470

U.S. 532, 542 (1985) (internal quotation marks and citations omitted; emphasis in original).

However, a pre-deprivation hearing is not required in all circumstances. See Zinermon v. Burch, 494 U.S. 113, 128 (1990) ("In some circumstances, however, the Court has held that a statutory provision for a postdeprivation [sic] hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process."). Mr. Temple failed to demonstrate he is likely to prevail on the merits of his claim that the BIA impoundment regulations violate his due process rights. Although Mr. Temple has a substantial interest in maintaining his property interest in the impounded cattle, especially because they are income- generating animals, the risk of governmental error is low. See Klump v. Babbitt, 108 F.3d 1385 (9th Cir. 1997).[14]

The BIA impoundment regulations require a detailed trespass notice be provided to the alleged trespasser. 25 CFR § 166.803. A person who receives a trespass notice is allowed to contact the BIA and explain why the notice is in error. Id. § 166.804. The alleged trespasser is warned of the actions the BIA may take and under what conditions those actions will be taken. 25 CFR §§ 166.806-807. The trespasser is notified of the BIA's intent to impound the

---

[14]Although Klump is an unpublished case, the Ninth Circuit recently reaffirmed the due process analysis set forth in Klump. See Yowell v. Abbey, 532 F. App'x 708, 710 (9th Cir. 2013), cert. denied, 135 S. Ct. 48 (2014) ("We conclude, for the reasons we have previously set forth, that the Bureau of Land Management ("BLM") was not required to provide a pre-deprivation hearing."). The Klump court's analysis of the BLM's impoundment regulations for trespassing livestock is directly on point with the issues before this court.

livestock.   Id. § 166.808.   The trespasser is given notice of the BIA's sale of the impounded livestock and how the property can be redeemed prior to the public sale.   Id. § 166.809-810.

Courts have frequently upheld the validity of similar impoundment regulations.   The Eighth Circuit previously held the Secretary of Agriculture was vested with the implied authority to promulgate impoundment regulations for the United States Forest Service.   Jones, 400 F.2d at 388.   In Jones, the court held the Secretary of Agriculture had the authority to impound plaintiffs' razorback hogs which were caught foraging in the Ozark National Forest.   Id. at 385, 388-89.   The Eighth Circuit reasoned the right to enjoin for trespass was implied because the "the United States, as a proprietor, has all the remedies available to it that a landowner has at common law."   Id. at 388.   The impoundment regulations at issue in Jones, 36 CFR § 261.13,[15] employ a regulatory procedure for the impoundment and disposal of unauthorized livestock that is similar to the impoundment regulations at issue in this case.

The Fifth Circuit reached the same conclusion.   See McVay v. United States, 481 F.2d 615, 617 (5th Cir. 1973).   In McVay, the Forest Service impounded nine of plaintiff's cattle which were found trespassing on the Kisatchie National Forest.   Id. at 616.   Plaintiff asserted the regulations[16]

---

[15]Although Jones references regulations contained in 36 CFR § 261.13, the applicable regulations have subsequently been reorganized under 36 CFR § 262.10.

[16]The applicable regulation is 36 CFR § 262.10.

33

under which the cattle were impounded violated his Fifth Amendment due process rights because no provision was made for notice and a hearing prior to the impoundment or for the opportunity to contest the validity of the claimed expenses.   Id.   The Fifth Circuit, citing Jones, determined the Secretary of Agriculture was authorized by Congress "to prevent trespassers and otherwise regulate the use and occupancy of property in the public domain, including the National Forests," and the regulations did not violate plaintiff's Fifth Amendment due process rights.   Id. at 617.

The Ninth Circuit reached the same conclusion in the context of BLM regulations governing the impoundment and disposition of trespassing livestock.[17]   See, e.g., Bedke v. Salazar, 540 F. App'x 601 (9th Cir. 2013), cert. denied sub nom. Bedke v. Cassia Cnty. Sheriff's Dep't, 134 S. Ct. 2300 (2014). The Ninth Circuit went so far as to note "[t]he impoundment of cattle pursuant to [the BLM's] regulations has never been held invalid."   Id. at 602.   The BLM's regulations governing the impoundment and disposition of trespassing livestock are similar to those employed by the BIA, namely in that neither provides for a pre-impoundment hearing.   Compare 43 CFR §§ 4150.1 to .4-5, with 25 CFR §§ 166.800-819; see also Klump, 108 F.3d at 1385.[18]

---

[17]The BLM, like the BIA, is a subdivision of the Department of the Interior.

[18]Buttressing the court's denial of defendant's motion to dismiss Mr. Temple's impoundment claims is the fact that neither the Jones, Bedke, Klump, nor McVay courts dismissed the plaintiffs' complaints challenging the agencies' impoundment of livestock for lack of subject matter jurisdiction.

The BIA has a substantial interest and a trust responsibility to preserve and protect Indian agricultural land.   Klump, 108 F.3d at 1385.   In light of the trespasser's opportunity to dispute the trespass, the multiple notices, the trespasser's opportunity to redeem the livestock, and the BIA's substantial interest in preserving Indian agricultural land, the court finds Mr. Temple failed to demonstrate he is likely to succeed on the merits of his Fifth Amendment due process claim relating to the BIA's impoundment regulations.[19]

Mr. Temple asserts because the BIA failed to provide him with adequate notice under the regulations, his due process rights were violated.   "The fundamental requisite of due process of law is the opportunity to be heard." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (internal quotation marks omitted) (quoting Grannis v. Ordean, 234 U.S. 385, 394 (1914)). "To be constitutionally adequate, due process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"   United States v. Colon, 993 F. Supp. 42, 44 (D.P.R. 1998) (quoting United States v. Giraldo, 45 F.3d 509, 511 (1st Cir. 1995) (citing Mullane, 339 U.S. at 306)).

---

[19]Mr. Temple also failed to demonstrate he is likely to succeed on his arguments relating to his ability to appeal the BIA's trespass determination as 25 CFR § 166.803(c) explicitly exempts BIA trespass determinations from appeal. The impoundment regulations do not require Mr. Temple be given a notice of appeal.   See 25 CFR §§ 166.800-819.   Mr. Temple retains the ability to pursue a subsequent administrative appeal and legal remedy challenging the costs, penalties and damage calculations associated with the redemption of the livestock.

The BIA sent letters by certified mail to Mr. Temple's home address on April 27, May 4, and May 5, 2015, informing him his livestock on range units 169 and 501 were in trespass.   (HE 2 & 3).   The April 27 letters informed Mr. Temple he must remove the trespassing cattle "or show why these livestock are not trespassing [on] this trust property."   (HE 2 at pp. 1, 5).   The May 4 and 5 letters informed Mr. Temple his cattle were in trespass, he had five days to remove them, and that no further notices would follow.   (HE 3 at pp. 2, 4).   On July 2, 2015, Mr. Her Many Horses responded to a letter from Mr. Bielecki and confirmed the BIA considered Mr. Temple's livestock to be in trespass, warned the BIA would proceed with its impoundment procedures and provided Mr. Temple with another opportunity to remove his cattle.   On August 12, 2015, Mr. Weston informed Mr. Bielecki via email that Mr. Temple had three days to remove his cattle before the BIA would begin impoundment.   Mr. Temple's cattle remained on range units 169 and 501.

Mr. Temple's livestock ultimately were impounded on August 19, 2015. On August 21, 2015, a letter informing Mr. Temple of the impoundment was sent by certified mail to Mr. Temple's home address.   (Docket 14-7 at p. 1).   A copy of the August 21 impoundment letter was hand-delivered to Holly Wilson.   (Docket 14-7 at p. 7).   A copy of the August 21 impoundment letter was also sent by regular mail to Terry Pechota, Mr. Temple's attorney in this action, and to Mr. Bielecki.   (Docket 12 at p. 16).

Mr. Temple's longstanding disagreement with the BIA and tribal officials over his rights to grazing permits for range units 169 and 501 was apparent at the TRO hearing.   Mr. Her Many Horses testified he believed Mr. Temple's cattle had been in trespass since 2013, the year in which Donald Buffington's grazing permits to those range units were signed.   Mr. Temple, through Mr. Bielecki, filed a claim before the Interior Board of Indian Appeal ("IBIA") challenging the allocation of the grazing permits to range units 169 and 501.[20]   See Docket 15-2 at p. 1.   In his June 5 letter, Mr. Bielecki acknowledged several notices of trespass that were issued against Mr. Temple and attributed the trespasses to Mr. Temple's lack of fencing to isolate his livestock on his individually allotted land.   Id. at 2.   Mr. Bielecki requested Mr. Her Many Horses "extend further patience" while Mr. Temple isolated his livestock to his allotted land.   Id.

Mr. Temple cannot now claim to be surprised by the impoundment of his cattle.   The BIA provided Mr. Temple with constitutionally adequate notice of the impoundment of his livestock.   Mr. Temple failed to demonstrate he is likely to succeed on the merits of his due process claim relating to a lack of notice.

### C.   APA Claim

Mr. Temple asserts the impoundment of his livestock was arbitrary or capricious.   The court reviews Mr. Temple's administrative claim under 5 U.S.C. § 706(2).   "Section 706(2)(A) requires a finding that the actual choice made was

---

[20]Mr. Temple voluntarily dismissed this action (IBIA Docket No. 13-149) to pursue his claims in Tribal Court, in part, because the contested issues involved matters pertaining to the Oglala Sioux Tribe's constitution and tribal ordinances. Id.

37

not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "   <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971), <u>abrogated on other grounds by Califano</u>, 430 U.S. at 99 (quoting 5 U.S.C. § 706(2)(A)).   "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."   <u>Id.</u> (citations omitted).   "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.   The court is not empowered to substitute its judgment for that of the agency."   <u>Id.</u>

"The Eighth Circuit Court of Appeals has characterized the test as requir[ing] that the agency decision be supported by a rational basis."   <u>Coomes</u>, 414 F. Supp. at 989 (citing <u>First National Bank of Fayetteville v. Smith</u>, 508 F.2d 1371, 1376 (8th Cir. 1974)).   "The party challenging the agency decision must show that the decision constitutes 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case.' "   <u>Id.</u> (quoting <u>First National Bank of Fayetteville</u>, 508 F.2d at 1376).   Based on the prior analysis and in light of the many warnings Mr. Temple received, the court cannot characterize Mr. Her Many Horses' impoundment actions as willful and unreasoning or unsupported by a rational basis.   Mr. Temple failed to demonstrate he is likely to succeed on the merits of his APA claim.

## II.    The Threat of Irreparable Harm

It is well established that a party is entitled to equitable relief only if there is no adequate remedy at law. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992). The district court should view the irreparable harm factor as weighing against the issuance of an injunction if there is an adequate remedy at law and the harm can be remedied through money damages. Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 300 (8th Cir. 1996) (finding preliminary injunctive relief unavailable where a plaintiff had "an adequate remedy at law, namely, the damages and other relief to which she will be entitled if she prevails"). Failure to show irreparable harm is an independently sufficient ground upon which to deny a TRO or preliminary injunction. See id. at 299; Gelco Corp. v. Coniston Partners, 811 F.2d 414 (8th Cir. 1987). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 425 (8th Cir. 1996).

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). When there is an adequate remedy at law, a preliminary injunction is not appropriate. Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989). "Once a court determines that the movant has failed to show irreparable harm absent an

injunction, the inquiry is finished and the denial of the injunctive request is warranted." Gelco Corporation, 811 F.2d at 420.

"Courts have . . . found irreparable harm where a party is threatened with the loss of a business and customer goodwill." Nokota Horse Conservancy, Inc. v. Bernhardt, 666 F. Supp. 2d 1073, 1080 (D.N.D. 2009) (citing Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995); Ryko Mfg. Co. v. Eden Servs., 759 F.2d 671, 673 (8th Cir. 1985) (affirming district court's finding that irreparable harm was shown and injunction was warranted when a distributor would possibly be forced out of business)); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970) (internal quotation marks omitted) ("[T]he right to continue a business in which [plaintiffs] had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; [plaintiffs] want to sell automobiles, not to live on the income from a damages award. . . . Moreover, they want to continue living. . . . [A] judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation.").

The parties do not dispute Mr. Temple will be injured if approximately 116 of his cattle are sold.  (Docket 34-1).  However, except for Mr. Temple's conclusory assertion that "[i]f [his] cattle are sold [his] entire livelihood will be threatened.  [He] is a rancher and depend[s] on the cattle to make a living. The sale of [his] cattle will likely lead to [his] financial ruin," (Docket 11 at p. 2), the court received no evidence demonstrating Mr. Temple would be *irreparably*

40

injured as a result of the impoundment and sale of the cattle.   For instance, the court received no evidence indicating how many cattle remained in Mr. Temple's herd following the impoundment, what proportion of Mr. Temple's herd would be sold, or any measureable evidence indicating Mr. Temple's ranching operation would be unable to continue as a going-concern business.   Conversely, the court received evidence that approximately another 248 of Mr. Temple's cows and 2 bulls, whether or not in trespass, remained on range units 169 and 501 alone.   (HE 22 at p. 1).   The court also received evidence that Mr. Temple has cattle on range units 506, 509, 512, 514 and 516.   (HE 12).

A monetary remedy challenging the BIA's damage calculation is also available to Mr. Temple as he retains the ability to redeem his cattle and pursue an action against the BIA.   See 25 CFR § 166.810; see also McVay, 481 F.2d at 617.   Depending on Mr. Temple's specific allegations and the amount of any damage claim, he may be able to pursue an action under 28 U.S.C. §§ 1346(a)(2), (b) or 1491).   In light of his available legal remedies, Mr. Temple failed to demonstrate an irreparable injury necessitating injunctive relief.

**III.   The Balance of Harm**

"[T]he balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public."   Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405, 1436 (N.D. Iowa 1996) (citing Dataphase Systems, Inc., 640 F.2d at 114).   In balancing the equities, no single factor is determinative.   The likelihood that

41

plaintiff ultimately will prevail is meaningless in isolation.   Every case must be examined in the context of the relative injuries to the parties and the public.   If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties should the injunction be granted, the moving party faces a heavy burden in demonstrating that he is likely to prevail on the merits.   Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.   See Dataphase, 640 F.2d at 113.

"Stated another way, the court balances the harms that would result in the following scenarios: (1) if the court improperly denied the preliminary injunction; and (2) if the court improperly granted the preliminary injunction." B.K. ex rel. Kroupa v. 4-H, 877 F. Supp. 2d 804, 822 (D.S.D. 2012), aff'd sub nom. Kroupa v. Nielsen, 731 F.3d 813 (8th Cir. 2013) (citing Scotts Co. v. United Indus. Corp., 315 F.3d 264, 284 (4th Cir. 2002) ("[W]hile cases frequently speak in the short-hand of considering the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied[.]").

The balance of the harm analysis weighs in favor of denying Mr. Temple's request for injunctive relief.   If the court was to improperly deny Mr. Temple's request for an injunction, his cattle would be sold and Mr. Temple would be financially injured.   However, Mr. Temple would still have a legal remedy to

pursue damages against the BIA for certain injuries.   Conversely, if the court improperly granted Mr. Temple's request for an injunction or granted injunctive relief based on Mr. Temple's allegations concerning the tribe's allocation of grazing permits, the court would insert itself into matters currently pending in Tribal Court and impede the BIA's enforcement of currently valid grazing permits.   In light of Mr. Temple's alleged continuing trespass (Dockets 24-1 & 24-2; and HE 22), Mr. Her Many Horses would be charged with the unenviable task of deciding whether to enforce Donald Buffington's grazing permit to land held in trust by the BIA or to comply with this court's order.   See HE 1.

Mr. Her Many Horses would be similarly hamstrung in his ability to meet the BIA's fiduciary obligations owed to approximately 392 other people for whom the land is held in trust.   See Docket 21 at p. 19.   The court received evidence that Mr. Temple consistently overstocked range units 169 and 501 for the past several years without a grazing permit to either.   (HE 23 & 24).   As a result, the yearlong carrying capacity for range unit 501 was reduced from 117 head to 97 head, (HE 23 at p. 2), and the yearlong carrying capacity for range unit 169 was reduced from 30 head to 23 head.   (HE 24 at p. 2).   Furthermore, in light of alleged ongoing trespass of Mr. Temple's cattle, Mr. Her Many Horses' ability to prevent the spread of Trich to neighboring cattle herds would be significantly impaired.   The court finds the balance of the harms factor weighs in favor of denying Mr. Temple's request for injunctive relief.

43

IV.   **The Public Interest**

This evaluation requires a "flexible consideration" of all four factors. Planned Parenthood, 530 F.3d at 729 (internal citation omitted).   Under Dataphase the district court should consider "the injury that granting the injunction will inflict on other parties."   640 F.2d at 113.   The public interest in this case is the BIA's obligation to preserve Indian agricultural lands.   Mr. Temple has not shown a likelihood of success on the merits.   He has an available legal remedy, and the alleged pre-impoundment conduct underlying his complaint must first be resolved in Tribal Court.   The court finds the public interest factor weighs in favor of denying Mr. Temple's request for injunctive relief.

All four Dataphase factors weigh in favor of denying Mr. Temple's request for injunctive relief.   The court denies Mr. Temple's motion for a TRO.

## MOTION TO SELL THE CATTLE

Having denied Mr. Temple's motion for a TRO, the defendant can resume the standard processing of Mr. Temple's cattle in accord with the applicable BIA regulations.   The court expresses no opinion on the legality of the defendant's proposed sale plan as this involves the resolution claims not presently before the court.   However, the court reminds the defendant of the BIA's obligation to sell the impounded livestock by public sale to the highest bidder in accord with 25 CFR § 166.811.   Mr. Her Many Horses' motion to sell the cattle is denied as moot.

Based on the above analysis, it is

44

ORDERED that Mr. Her Many Horses' Rule 12(b)(1) motion to dismiss (Docket 32) is granted in part and denied in part.   Mr. Her Many Horses' motion to dismiss Mr. Temple's Fifth Amendment due process claims and APA claim relating to the impoundment of Mr. Temple's cattle is denied.   Mr. Her Many Horses' motion to dismiss Mr. Temple's claims relating to Mr. Her Many Horses' pre-impoundment conduct and Mr. Her Many Horses' assessment of penalties and costs and damage calculation is granted.

IT IS FURTHER ORDERED that Mr. Temple's claims relating to Mr. Her Many Horses' pre-impoundment conduct and assessment of penalties and costs and damage calculation are dismissed without prejudice.

IT IS FURTHER ORDERED that Mr. Temple's motion for a temporary restraining order (Docket 5) is denied.

IT IS FURTHER ORDERED that Mr. Temple's motion to extend (Docket 35) is denied as moot.

IT IS FURTHER ORDERED that Mr. Her Many Horses' motion requesting permission to sell the impounded cattle (Docket 43) is denied as moot.

Dated February 19, 2016.

BY THE COURT:

JEFFREY L. VIKEN
CHIEF JUDGE