UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION



FILED

DEC 0 8 2023

|  |  |
|---|---|
| CURTIS TEMPLE, | 5:15-CV-05062-CBK |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT,** |
| | **CONCLUSIONS OF LAW, AND** |
| LAWRENCE ROBERTS, Assistant Secretary of Indian Affairs, Department of Interior, Bureau of Indian Affairs; TIM LAPOINTE, Northern Plains Regional Director, Department of Interior, Bureau of Indian Affairs; LIONEL WESTON, Branch of Realty, Pine Ridge Agency, Department of Interior, Bureau of Indian Affairs; and JOHN LONG, Acting Superintendent of the Pine Ridge Agency, Department of Interior, Bureau of Indian Affairs; | **JUDGMENT** |
| Defendants. | |

## BACKGROUND

This is an action for judicial review of agency action as authorized by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706. All defendants are employees of the United States Department of Interior, Bureau of Indian Affairs ("BIA"). Plaintiff seeks declaratory and injunctive relief, along with an accounting, damages, attorney's fees, and costs arising out of the impoundment of his livestock in 2015 and 2016. He contends the actions by defendants were in violation of the Constitution, statutes, regulations, and policies of the United States.

This action has a tortuous history. In reaching the decisions made herein, I have considered the entire docket, including a prior Oglala Sioux Tribal Court decision entered into the record, prior transcripts, findings of facts and conclusions of law previously entered in this case, along with the testimony and evidence received at the court trial.

## FINDINGS OF FACT

Plaintiff is a cattle rancher.  His claims arise out of the leasing of various Range Units on the Pine Ridge Indian Reservation in South Dakota.   In an opinion filed in this case, the Oglala Sioux Tribal Court set forth the very relevant legal and factual background concerning the leasing of Range Units on the Oglala Sioux Tribe Pine Ridge Indian Reservation in South Dakota.

> Grazing land is one of the most valuable assets of the Tribe and its members, and is often a point of contention between tribal ranchers, who can be described fairly as competitive with each other with regard to leases, because of the value of such leases to tribal members who ranch.  Pursuant to a scheme initiated by the United States of America, grazing land is divided into Range Units, which are numbered tracts of range land designated as management units for the administration of grazing privileges by the Tribe and the United States Bureau of Indian Affairs (hereinafter "BIA").  Range Units may consist of tribal trust (or restricted) land, individual trust (or restricted) land, government land, or any combination thereof, consolidated for grazing purposes.

> Under existing tribal and federal law, the awarding of grazing privileges for Range Units on the Reservation is carried out jointly by the Tribe and the BIA.  In most cases, grazing privileges are awarded pursuant to the Tribal Grazing Code, O.S.T. Ord. No. 17- 15, and the federal regulations at 25 C.F.R. Part 166.  Under the Tribal Grazing Code, allocation applications and competitive bids are submitted to the Oglala Sioux Tribe's Allocation Committee.  The Allocation Committee reviews the applications and bids, makes eligibility determinations, and approves or denies applications and bids.  The decisions of the Allocation Committee are forwarded to the Superintendent of the Pine Ridge Agency of the BIA as recommendations. The Superintendent makes the final decisions to award Grazing Permits, pursuant to the regulations at 25 C.F.R. Part 166.

> Under the Tribal Grazing Code, grazing privileges for Range Units are awarded through an allocation process.  Range Units that remain available after the allocation process are subject to competitive bidding.  Tribal member livestock operators, those with no more than 300 head of livestock, are permitted to use the allocation process without competitive bidding, while other operators must compete for Range Units in the competitive bidding process.  Preference is given in the competitive bidding process to tribal members with more than 300 head of cattle.  Fraud and false statements in connection with allocation applications and competitive bids are not permitted.

2

> The Grazing Code provides a comprehensive administrative remedy for an individual aggrieved by a decision of the Allocation Committee. Under [the 2011 Tribal Grazing Code], the administrative remedy consisted of an appeal to the Oglala Sioux Tribe Executive Committee. Under [the 2017 Tribal Grazing Code], the administrative remedy consists of an appeal to an Administrative Law Judge ("ALJ").
>
> An exception to this process exists for Range Units consisting *entirely* of tribal trust land. Such Range Units are not included in the Range Management Program and Grazing Leases for those Range Units are not governed by the Tribal Grazing Code. Instead, the Grazing Leases are awarded through the Land Office of the Tribe, not the Allocation Committee, and the leases are subject to approval by the United States pursuant to 25 U.S.C. § 177.

Temple v. OST Allocation Committee, et al., Oglala Sioux Tribal Court, CIV 13-0533 (August 22, 2019), at pp. 5-6 (filed herein at Doc. 180-1). The evidence received at trial is consistent with the Oglala Sioux Tribal Court's opinion.

The Oglala Sioux Tribal Court found, and such finding is consistent with the evidence received at trial in this case, that the plaintiff had grazing permits for, *inter alia*, Range Units 169 and P501 which expired on October 31, 2012. He applied for an allocation of those units in 2012 but the Allocation Committee determined that he was ineligible because he had 1,622 cattle on the Reservation, well over the 300 head maximum under the Tribal Grazing Code. The Allocation Committee awarded 2012 grazing privileges to another tribal member who had 92 cattle on the Reservation, Donald "Duke" Buffington.

Plaintiff was notified on October 17, 2012, by the BIA that he was not awarded leases for Range Units 169 and P501 because he was ineligible for those leases. Plaintiff appealed the decision of the Allocation Committee to the Executive Committee. Following a hearing in March 2013, the Executive Committee denied the appeal. The Superintendent issued grazing permits to Buffington as requested by the Allocation Committee for the period November 1, 2012 through October 31, 2017.

Plaintiff filed an appeal of the Superintendent's actions to the Great Plains Regional Office of the BIA. The BIA Regional Director denied the appeal in August

3

2013, and upheld the Superintendent's issuance of the grazing permits to Buffington. Plaintiff appealed the Regional Director's decision to the Interior Board of Indian Appeals ("IBIA") in September 2013. He withdrew that appeal in May 2015.

The BIA manages Range Units for the financial benefit of the many joint or individual owners of tracts in the Range Unit. The BIA issues the permits, invoices the permittee, and pays over the rents received to the beneficial owners. As part of its trust responsibilities, the BIA also manages the use of the Range Units. BIA rangeland specialists determine the grazing capacity of trust lands. The permits set forth how many cattle per acre are allowed to graze each Range Unit to preserve the income producing capacity of the Range Unit for the owners.

Range Unit 169 comprises 1,149.5 acres. The five-year permit stocking rate for 2012-2017 authorized grazing for 30 head of cattle. The total stocking rate for the five-year permit grazing seasons from 2012 to 2017 was set at 364 head of cattle. The annual grazing rental (income to the beneficial owners) was $5,802.35.

Range Unit P501 comprises 5,070.72 acres. The five-year permit stocking rate for 2012-2017 authorized grazing for 117 head of cattle. The total stocking rate for the five-year permit grazing seasons from 2012-2017 was set at 1,409 head of cattle. The annual grazing rental was $21,786.78.

Plaintiff had grazing permits for Range Units 169 and P501 which expired on October 31, 2012. He did not remove his cattle from those Range Units, even after the lease for those units was allocated to another tribal member. The new permittee was unable to graze his cattle on those Range Units because plaintiff's cattle were grazing on those units. Then Superintendent Her Many Horses testified in August 2015, that during the first permit year, the new permittee's cattle "were run off" and during the second and third permit years the new permittee did not try to graze his cattle on his permitted Range Units because plaintiff's cattle were still there. The BIA was unable to invoice the permittee for payment because the permittee did not have any use of the permitted Range Units. Plaintiff did not pay for his hold-over use of those Range Units. Consequently, the landowners received no payment from the use of their Range Units during those years.

4

Beginning in April 2013, natural resource officers for the Great Plains Region of the BIA began conducting field checks on those Range Units as a normal part of their trust responsibilities. The BIA used sophisticated GPS devices to determine on what parcel any particular animal was grazing. The BIA was careful not to count cattle that were trespassing on parcels in which plaintiff had an ownership interest.

An April 12, 2013, compliance check conducted on Range Unit 169 found 6 cattle grazing in trespass. Because the brands could not be identified, public notice of trespass was issued.

On April 25, 2013, field compliance checks were conducted of Range Units P501 and 169. Plaintiff was notified on April 30, 2013, that 228 head of his cattle were found grazing in trespass on Range Unit P501 and 56 head of cattle were found grazing in trespass on Range Unit 169. Plaintiff was directed to remove the trespassing livestock or impoundment procedures might be implemented.

A May 9, 2013, compliance check found 286 of plaintiff's cows trespassing on Range Unit P501. Plaintiff was notified by certified mail that he had failed to comply with the prior notice of trespass and that he was liable for the value of the products illegally removed (eaten by his cattle) plus a penalty of twice the value. The total due to the BIA for the continuing trespass was calculated at $5,378.52. Plaintiff was also notified that his livestock are subject to impoundment after five days without further notice.

Plaintiff filed suit in the Oglala Sioux Tribal Court against the OST Allocation Committee and others in 2013 challenging the allocation of grazing permits for Range Units 169 and P501. He filed two other suits in the Oglala Sioux Tribal Court in 2015 and 2018 challenging the allocation of the grazing permits to persons other than plaintiff. Although the cases were eventually consolidated by the Tribal Court, only the first action concerns the allocation of the grazing permits at issue in this case.

A compliance inspection was conducted on March 7, 2014, on Range Unit 169 and 127 head of cattle were found to be grazing in trespass. Plaintiff was directed to remove the cattle or impoundment procedures might be implemented.

A September 25th, 2014, compliance check found 177 of plaintiff's cattle dispersed throughout Range Unit P501. Horses bearing plaintiff's brand were also found grazing on Range Unit P501. Plaintiff was notified by certified mail that his livestock were in trespass and must be moved within five days or impoundment procedures might be implemented. Plaintiff signed the delivery receipt for this notice.

On April 22, 2015, a compliance check counted 214 head of plaintiff's livestock dispersed throughout Range Unit P501. Plaintiff was notified by certified mail that the cattle were in trespass, that he had three days to remove the livestock, and that if the livestock are not removed, penalties may be assessed and impoundment and subsequent sale of the trespassing livestock may be necessary.

An April 22, 2015, compliance check of Range Unit 169 was conducted and 38 head of livestock belonging to plaintiff were found grazing in trespass. Plaintiff was notified by certified mail on April 27, 2015, that he had three days to remove the livestock are penalties would be assessed and impoundment and sale of the trespassing livestock may occur.

A May 4, 2015, compliance check of both parcels was conducted to determine if he had complied with the April 27, 2015, order to remove livestock. The inspection found 12 head of cattle and 4 horses grazing in trespass on Range Unit 169 and 172 head of livestock grazing in trespass on Range Unit P501.

Upon motion of the plaintiff, the Oglala Sioux Tribal Court issued an emergency temporary restraining order enjoining the BIA from taking any action respecting impoundment on May 14, 2015. Although the BIA protested the Tribal Court's jurisdiction over a federal agency or its employees, the BIA complied with the restraining order and did not impound plaintiff's cattle.

On June 2, 2015, a compliance check of Range Unit 169 was conducted and 92 head of plaintiff's livestock were found still grazing in trespass. On that same date, a compliance check was conducted of Range Unit P501 and 165 head of plaintiff's livestock were found grazing in trespass.

Plaintiff's lay advocate (representing plaintiff in the Oglala Sioux Tribal Court in matters concerning the grazing permits) responded to the June 2, 2015, notice of trespass on June 5, 2015. In that letter, plaintiff claimed to own several thousands of acres in Range Units 169 and P501. The Superintendent of the BIA Pine Ridge Agency, Cleve Her Many Horses, responded to "counsel" on July 2, 2015. In that response, plaintiff's "counsel" was notified that plaintiff only owned an undivided interest in six tracts in the two range units totaling 290.85 acres. Plaintiff was notified that he could request that those acres be removed from the grazing permits provided that a lease or permit was developed to provide income to the other beneficial owners of those tracts. He was also notified that he would have to construct a fence around those tracts. Finally, in that letter, the BIA gave notice that it intended to proceed with trespassing and impoundment procedures if plaintiff's trespassing livestock were not removed.

Plaintiff testified that he did notify the BIA that he wanted acres in which he had a beneficial interest removed from the Range Units and claimed that he was entitled to graze his cattle on his own land, notwithstanding any permit issued or not issued. Plaintiff did not produce any record of having made any request to have acres in which he owned a beneficial interest removed from the Range Units. Plaintiff was unable to articulate the approximate date he allegedly made the request. It is undisputed that, even if plaintiff did request to remove the tracts as he contends, plaintiff did not erect a fence around those tracts which was required before plaintiff could graze his cattle on tracts contained within the Range Units in which he had an ownership interest. There was never any contention in the record that plaintiff had an agreement to pay the other interested owners in those tracts any rent for plaintiff's use of the tracts.

Plaintiff did not remove his cattle from the range units in response to the July 2, 2015, notice. On July 8, 2015, a compliance check found 236 of plaintiff's cattle grazing in trespass on Range Unite P501. On that same date, a compliance check of Range Unit 169 was conducted and one head of plaintiff's cattle was found grazing in trespass.

A compliance check was conducted on July 21, 2015, on Range Units P501 and 169. At that time, a total of 100 of plaintiff's cows, bull, and horses were grazing in

7

trespass on Range Unit P501. In addition, 204 head of plaintiff's livestock were observed grazing on another tract not included in Range Units P501 or 169 but, due to open gates and cut fences, those animals had unauthorized access to the Range Units.

The Tribal Court dismissed the federal defendants from plaintiff's suits on August 3, 2015, finding no jurisdiction over the United States.

On August 5, 2015, a compliance check was conducted on Range Units 169 and P501 and 267 head of plaintiff's livestock were found to be grazing in trespass. Additionally, two cows belonging to Trey Temple and Tammy Steele (defendant's son and his son's mother) were observed.

On August 12, 2015, the BIA sent notice to plaintiff to remove his cattle from the Range Units or the cattle would be impounded. A compliance check was conducted on August 17, 2015. On Range Unit P501, 204 head of plaintiff's livestock were found to be grazing in trespass. On Range Unit 169, 28 head of livestock were found grazing in trespass.

Plaintiff failed to remove his cattle and, on August 19, 2015, the BIA impounded 121 head of cattle, five of which were branded with a brand registered to Trey Temple and Tammy Steele. No cattle were rounded up and impounded that were, at the time of impoundment, grazing plaintiff's parcels. Plaintiff filed this federal action the next day.

Plaintiff was notified on August 21, 2015, by certified letter, that 121 head of his livestock, along with five head registered to Trey Temple and Tammy Steele, were impounded (the "first impoundment") and would be sold at the Gordon Livestock Auction unless redeemed. The redemption cost included $26,100.29 for the costs of impoundment, $82,767.39 for the value of the forage consumed by the trespassing animals, plus a penalty of $165,534.78 based upon twice the value of the forage, for a total redemption amount of $274,402.46. Plaintiff was formally notified that the costs for redemption would increase daily for yardage and feed costs while the livestock were at the holding facility.

On August 27, 2015, and August 31, 2015, now retired U.S. District Judge Jeffrey L. Viken held two days of hearings on plaintiff's request for a temporary restraining order as to the first impoundment. Following post hearing briefing and supplementation of the

8

record, on February 19, 2016, Judge Viken issued a memorandum opinion and order denying plaintiff's motion for a temporary restraining order. Temple v. Her Many Horses, 163 F. Supp.3d 601 (D.S.D. 2016).

On September 3, 2015, the cattle impounded during the first impoundment were moved from the Gordon Livestock Auction to Johnson Ranch near Crawford, Nebraska. The Gordon Livestock owner told the BIA he did not want to sell the cattle because he feared litigation if he continued to be involved in this matter.

Also on September 3, 2015, plaintiff appealed the impoundment to the Great Plaines Regional Director of the BIA.

When the impounded cattle arrived at Johnson Ranch, they were tested pursuant to Nebraska livestock import regulations. One of the bulls tested positive for Trichomoniasis, a contagious disease. Nebraska state regulations required quarantine and destruction of the infected bull and any bull subsequently testing positive. Any exposed breeding female cattle was required to be sold for slaughter. At that point, the infected as well as exposed cattle could not be returned to South Dakota.

There was some inconsistency in the record as to how many cows and bulls were impounded. The BIA clarified on October 26, 2015, that 114 cattle were originally corralled, that ten animals entered the corral while the brand inspector was working, and three animals escaped. The total number of animals impounded was 121, five of which belonged to Trey Temple and Tammy Steele, who had not sought return of their cattle. Following impoundment, cattle died, calves were born, and one infected bull was destroyed.

Although plaintiff maintained without any evidentiary basis throughout this litigation that the actions of the defendants resulted in the infection of his cattle with Trichomoniasis, the record shows that some of the plaintiff's cattle that remained in South Dakota also tested positive. Although the cattle were not tested when they were removed from the Pine Ridge Indian Reservation prior to transport to Gordon, Nebraska, there is nothing in the record to suggest that any actions of the defendants caused or resulted in the infection of the cattle or bulls impounded.

The Nebraska Department of Agriculture, the owner of Johnson Ranch, and his neighbors were concerned about the delay in the disposition of plaintiff's infected/exposed cattle. Due to the defendant's request for a TRO, the BIA was prevented from proceeding with the disposition of the cattle until Judge Viken issued his decision denying plaintiff's request for injunctive relief.

While the first impoundment was being litigated, the BIA continued to conduct compliance checks which found that plaintiff continued to graze his cattle in trespass on Range Units 169 and P501. On September 16, 2015, compliance checks were conducted on Range Units P501 and 169. Eighty-one head of livestock belonging to plaintiff were found grazing in trespass on Range Unit 501, along with two cows belonging to Trey Temple and Tammy Steele. A September 16, 2015, compliance check was conducted and 81 head of livestock belonging to plaintiff were grazing in trespass on Range Unit P501, along with two head of cattle belonging to Trey Temple and Tammy Steele.

On September 23, 2015, compliance checks were conducted on Range Units P501 and 169 and 32 head of livestock belonging to plaintiff, along with one cow belonging to Trey Temple and Tammy Steele, were found grazing in trespass on Range Unit P501. Two days later, a compliance check was conducted and 50 head of livestock belong to plaintiff, Trey Temple, and Tammy Steele were found grazing in trespass on Range Unit P501.

Compliance checks were conducted on Range Units P501 and 169 on October 30, 2015. Cows found grazing in trespass belonging to plaintiff numbered 32 on Range Unit P501 and eight on Range Unit 169. A compliance check conducted on November 10, 2015, on Range Unit 169 found 19 cows grazing in trespass.

On February 2, 2016, the South Dakota Assistant State Veterinarian issued a herd disposition plan for plaintiff's cattle. Both the part of the herd being held in Nebraska and the part of the herd remaining in South Dakota on Range Units 169 and P501 had tested positive for Trichomoniasis, and South Dakota considered the cattle owned by plaintiff as essentially one herd.

10

Plaintiff continued to graze his cattle in trespass on Range Units 169 and P501. A February 7, 2016, compliance check found 224 head of livestock grazing in trespass on Range Unit 169 and 16 head of livestock grazing in trespass on Range Unit P501.

Plaintiff was ordered on February 24, 2016, to remove his unauthorized livestock or show why the livestock had any right to graze on the Range Units. On March 2, 2016, the BIA conducted compliance checks on Range Units 169 and P501 and found plaintiff's cattle grazing in trespass.

On March 9, 2016, the BIA notified plaintiff that the BIA intended to proceed with trespass and impoundment procedures for the continuing trespasses on Range Unit 169 if the trespassing cattle were not removed. The BIA also notified plaintiff of the South Dakota Assistant Veteraniarian's herd disposition plan which is applicable to plaintiff's cattle grazing on Range Unit 169. The same notice was provided to plaintiff on March 11, 2016, as to Range Unit P501. Pursuant to the plan, the infected bull was destroyed. Infected cattle had to be sold for slaughter. Cattle that were exposed but not infected had to be sold with a disclosure that they came from an infected herd.

On March 14, 2016, the Great Plains Regional Director of the BIA issued a decision on plaintiff's appeal of the first impoundment. The Regional Director found that the record supports that plaintiff's cattle were grazing in trespass, that plaintiff was provided with adequate pre-impoundment notice consistent with the regulations, and plaintiff's due process rights were not violated when his livestock was impounded. The Regional Director held, however, that plaintiff's challenge to the monetary levies arising out of the first impoundment was not ripe.

Following the resolution of plaintiff's administrative appeal and Judge Viken's denial of an injunction preventing the sale of the cattle from the first impoundment on March 15, 2016, the BIA sent to the plaintiff a notice of sale and procedures to redeem the portion of the herd held in Nebraska. The redemption amount was set forth with specificity as to the value of products illegally removed and the penalty assessed as to each tract per years 2013, 2014, and 2016. The total amounted to $246,383.55 plus enforcement and impoundment costs which had substantially increased to $72,763.20.

11

Public sale of the cattle from the first impoundment was scheduled to take place at the Platte Valley Livestock Auction but the sale barn backed out of the sale when plaintiff's tribal lay advocate sent an email to the sale barn on March 16, 2016, falsely stating that the Court denied permission to sell the cattle, advising Platt Valley Livestock that it may be liable, and threatening legal action if it chose to sell plaintiff's cattle. On March 17, 2016, Judge Viken entered an order making clear that the BIA was entitled to continue the standard processing of plaintiff's impounded cattle, including sale. Judge Viken cautioned the plaintiff's tribal advocate against acting as plaintiff's attorney on matters outside of tribal court.

On March 25, 2016, the livestock were offered for sale by sealed bids to be opened April 6, 2016. The slaughtered bull was offered for sale separately. The BIA sold plaintiff's cattle from the first impoundment for $72,658.35. Plaintiff's lienholder, Bank of the West, submitted a claim for all the proceeds from the sale of the cattle from the first impoundment cattle and all sale proceeds were paid over to the lienholder.

On or about April 11, 2016, plaintiff filed a notice of appeal to the Interior Board of Indian Appeals from the March 14, 2016, Regional Director's decision on plaintiff's administrative appeal of the first impoundment. That appeal is still pending and the IBIA has issued no ruling on that appeal.

The BIA Superintendent of the Pine Ridge Agency issued a final assessment of damages, costs, and penalties from the first impoundment on September 28, 2016, in the amount of $236,931.29. Plaintiff did not timely appeal that decision to the Regional Director within 30 days and that notice became the final agency decision as to the first impoundment.

On June 21, 2016, the BIA impounded 241 head of cattle from Range Unit P501 that had been trespassing on both Range Unit 169 and P501 (the "second impoundment"). Plaintiff was notified by the Superintendent of the Pine Ridge Agency of the sale scheduled for June 29, 2016, and his right to redeem the cattle by paying the value of the forage illegally removed plus penalty in the amount of $59.174.37 and costs of $14,824.02.

The cattle impounded on June 21, 2016, were held at the Mitchell Livestock Auction. On June 28, 2016, plaintiff filed a complaint against the Mitchell Livestock Auction in South Dakota Circuit Court, Fifth Judicial Circuit, Davison County, 17CIV16-000175, alleging that the proposed sale of his cattle was illegal and requesting a temporary restraining order prohibiting the sale. Mitchell Livestock Auction informed the BIA that it would not be involved in the sale of plaintiff's cattle.

On June 29, 2016, plaintiff administratively appealed the second impoundment to the Regional Director of the Great Plains Office of the BIA. The Regional Director held, in his July 18, 2016, decision, that the impoundment and pending sale of the livestock is not appealable and the calculation of damages, costs, and penalties is not ripe for appeal. The Regional Director notified plaintiff that he could appeal the Regional Director's decision to dismiss his premature appeal to the Interior Board of Indian Appeals within 30 days.

On August 18, 2016, plaintiff filed a notice of appeal to the Interior Board of Indian Appeals from the July 18, 2016, Regional Director's decision on plaintiff's administrative appeal of the second impoundment. That appeal is still pending and the IBIA has issued no ruling on that appeal.

The public sale of the cattle from the second impoundment was not conducted. On September 19, 2016, plaintiff filed in this matter a request for a restraining order to prevent the sale of his cattle, objecting to the method and timing of the notice of sale. Judge Viken denied the motion for a restraining order.

The livestock were scheduled to be sold by sealed bids to be opened September 21, 2016, and subsequently continued to November 16, 2016. The redemption amount was $147,887.23, owing to the substantially increased pasturihg costs. On November 16, 2016, plaintiff redeemed the cattle associated with the second impoundment.

The BIA Superintendent of the Pine Ridge Agency issued a final assessment of damages, costs, and penalties from the second impoundment on January 3, 2017, in the amount of $39,133.40 for the care of 110 head of cattle which were not immediately claimed by defendant when he redeemed the other cattle impounded. Plaintiff did not

13

timely appeal that final assessment to the Regional Director within 30 days and that assessment became the final agency decision as to the second impoundment.

On March 22, 2017, the BIA sent notices to counsel for the plaintiff advising plaintiff that the unpaid indebtedness from the two impoundments could result in the BIA's refusal to issue any grazing permits to plaintiff. Plaintiff was further notified that the BIA will utilize collections techniques including the Treasury Offset Program. On June 22, 2017, the Department of the Treasury issued a collection notice to plaintiff. On July 25, 2017, plaintiff's lay tribal advocate sent a letter to the United States Treasury stating that he represented plaintiff, denying that he or plaintiff were aware of any debt, and threatening to file a $600 billion lawsuit against the BIA.

On September 20, 2017, plaintiff, through counsel, filed a federal tort claim action arising out of the foregoing events seeking $552,025.00 in damages, 5:17-cv-05075-CBK. That case was previously assigned to Judge Viken and was stayed pending resolution of this matter. Counsel has moved to withdraw in that case, claiming Temple has failed to pay legal fees of more than $100,000.00.

Pursuant to plaintiff's letter request of November 4, 2016, trust status of a total 11,374.30 acres contained in 58 separate parcels which plaintiff owns in fee was terminated and those acres were removed from the Range Unit Program on March 21, 2017. Plaintiff was reminded that, if he is not the grazing permittee of a particular range unit, he would have to fence his deeded lands which were geographically contained in a range unit.

Pursuant to the BIA's trust responsibility, on September 29, 2015, the Regional Range Management Specialist, conducted a grazing assessment of Range Units 169 and P501. He concluded that, based upon overgrazing conducted by plaintiff, the grazing capacity of Range Unit 169 should be reduced from 30 animal units to 23 animal units and the grazing capacity of Range Unit P501 should be reduced from 117 animal units to 97 animal units.

The Regional Range Management Specialist conducted another inspection of Range Units 169 and P501 and, on August 3, 2016, the Inspector notified the

14

Superintendent of the Pine Ridge Agency that, due to excessive overgrazing, sometimes by as many as 7.5 times the allowable head of cattle, he had changed his September 29, 2015, grazing recommendation.  The Specialist now recommended that there be no grazing on Range Unit 169 for the remainder of 2016 and until at least June 15, 2017, to allow the Range Unit to recover from overgrazing.  The Specialist recommended there be no further grazing on a portion of Range Unit P501 until 2017 due to heavy use.  That heavy use was caused by plaintiff grazing without authority.

Plaintiff claims that his impounded cattle were grazing his land as he was entitled to do.  Plaintiff did not own the acres in question but, rather, had an undivided interest in those acres along with other interest owners.  There is no record that plaintiff received permission from the other owners or ever paid them for the use plaintiff made of those acres.  In any event, the acres in which plaintiff had a beneficial interest were part of the Range Units and were controlled by the permits.  After the expiration of the permits in 2012, plaintiff had no right to graze his cattle on Range Units 169 or P501.

Range Unit 169 had an authorized stocking rate of 30 head of cattle.  Range Unit P501 had an authorized stocking rate of 117 head of cattle.  The record is replete with evidence that plaintiff almost continually allowed his cattle to graze in trespass in numbers greatly exceeding the capacity of those range units.

Plaintiff's claim that it was his intention that his cows only graze on "his" land is ludicrous since there were no fences to keep his cattle from grazing the entire Range Units and his cattle enormously exceeded the grazing capacity of the acres in which he had an interest.

Plaintiff's over-grazing of the Range Units resulted in long term damage to the grasses.  The BIA was required to reduce the stocking rate – the number of cattle allowed to graze each unit – in an effort to allow the Range Units to recover.  This reduction resulted in less income to the beneficial owners.

The Tribal Court found that plaintiff submitted applications and bids for grazing privileges for several Range Units in January 2018.  Plaintiff was notified on February 5, 2018, by the BIA that he was ineligible to receive grazing permits because he owed

$355,531.40 to the BIA which was attributable to trespass fees, penalties, damages, and costs assessed against plaintiff by the BIA for trespassing livestock on Range Units 169 and P501. Plaintiff appealed that decision to an A.L.J. as required by the 2017 Tribal Grazing Code. In March 2018, the A.L.J. upheld the decision not to award grazing permits to the plaintiff, finding that the Grazing Code's provision that delinquency on an outstanding debt to the BIA precludes an award of any grazing permit is "mandatory."

In March 2018, plaintiff again applied for an allocation of grazing privileges for several Range Units. His application was denied by the Allocation Committee less than one week later based upon his outstanding debt to the BIA. The BIA notified plaintiff of the decision to deny grazing permits to him and plaintiff appealed to the A.L.J. In October 2018, the A.L.J. affirmed the decision of the Allocation Committee.

## PRIOR CASE DECISIONS

As set forth previously, plaintiff instituted this action on August 20, 2015, following the first impoundment of his cattle. He moved for a temporary restraining order preventing the sale or disposition of the cattle impounded. Two days of hearings were conducted in August 2015, following by extensive briefing and supplementation of the record. Defendants filed a motion to dismiss which was also followed by briefing. On February 19, 2016, Judge Viken issued an opinion and order denying plaintiff's motion for a temporary restraining order and dismissing plaintiff's claims as to pre-impoundment conduct (the issuance of the permits to some other person instead of to plaintiff) and as to the BIA's monetary assessments arising out of impoundment. Temple v. Her Many Horses, 163 F.Supp.3d 602 (D.S.D. 2016).

Following the second impoundment in June 2016, plaintiff filed on September 19, 2016, a motion for a temporary restraining order preventing the sale and disposition of the cattle impounded. A hearing was held on September 22, 2016. During that hearing, Judge Viken denied the motion for a temporary restraining order and ordered plaintiff to file an amended complaint to properly bring matters relating to the second impoundment before the Court. Plaintiff filed an amended complaint on October 7, 2016, adding three

16

new parties and 15 new claims. Defendants filed motions to dismiss and for partial summary judgment. Defendants also filed an answer, thus allowing discovery to proceed.

While the pending motions were being briefed, plaintiff was charged in 5:17-cr-50062-JLV with destruction of government property – willfully injuring and committing depredation by overgrazing and overstocking range units. This case was stayed pending resolution of the criminal case. The criminal case was dismissed upon motion of the government on May 24, 2018, and the stay in this case was lifted on that same date.

Judge Viken issued a decision on August 29, 2018, on the pending motions. Temple v. Roberts, 2018 WL 4120036 (D.S.D. 2018). Judge Viken held that the amended complaint failed to detail the conduct of the specific defendants which allegedly violated regulatory, statutory, or constitution provisions. Judge Viken described the allegations of the amended complaint as "shotgun pleading" and the claims raised as "kitchen-sink" filing. Judge Viken ordered plaintiff to file a second amended complaint to cure the deficiencies. Judge Viken further held that the Court's February 2016, order "constitutes the law of the case and it must 'govern the same issues in subsequent stages in [this] case.' In re Tri-State, 885 F.3d at 533. The 'subsequent stages' include amended pleadings and eventual trial. Id." Judge Viken held that the law of the case doctrine prevents plaintiff from relitigating claims relating to pre-impoundment conduct or the BIA's assessment and damage calculations.

Plaintiff filed a second amended complaint on October 2, 2018. Defendants filed a motion to dismiss and an answer. On September 13, 2019, Judge Viken issued his order on the motion to dismiss. Temple v. Roberts, 2019 WL 4773929 (D.S.D. Sept. 30, 2019). Judge Viken referred to the findings of fact set forth in Temple v. OST Allocation Committee, et al., Oglala Sioux Tribal Court, CIV 13-0533 (August 22, 2019), at pp. 5-6 (filed herein at Doc. 180-1). I also relied upon that Tribal Court decision herein.

Judge Viken reiterated his earlier decision that exhaustion was not required of plaintiff's claims related to impoundment of his livestock. Judge Viken held the earlier ruling was the law of the case. Plaintiff nevertheless filed appeals to the IBIA of the

BIA's trespass and impoundment decisions. Judge Viken determined that the case should be stayed pending resolution of the appeal process.

In the second amended complaint, plaintiff again raised claims as to the BIA's assessment of costs, damages, and penalties in relation to the findings of trespass and the impoundments. While noting that plaintiff did not appeal the final monetary assessments to the Regional Director, Judge Viken noted in the September 30, 2019, decision that plaintiff appealed issues as to preliminary monetary assessments to the IBIA. Judge Viken stayed plaintiff's claims as to the assessments, concluding that the IBIA would rule whether plaintiff had exhausted the claims in filing an appeal prior to the final assessment decisions.

Judge Viken dismissed claims in the second amended complaint which alleged the BIA violated the regulations requiring a public sale when sales were ultimately accomplished by sealed bidding. Judge Viken held that plaintiff never appealed the notices of sealed bids to the BIA and had thus defaulted those claims.

Plaintiff alleged in his second amended complaint a claim that the BIA had wrongly refused to conduct a survey to identify allotted parcels contained in the range units in which he had an interest. Plaintiff has claimed since the inception of the trespass notices that he owns land within the range units and cannot be in trespass for grazing his cattle on his own land. Judge Viken dismissed this claim because plaintiff did not present his claim to the BIA and failed to administratively exhaust his survey claim.

Judge Viken had dismissed plaintiff's claim in his original complaint that the Oglala Sioux Tribe and the BIA improperly deprived him of grazing permits. Plaintiff reasserted that claim in the second amended complaint. Judge Viken dismissed plaintiff's pre-impoundment conduct claims asserted in the second amended complaint.

In the second amended complaint, plaintiff alleged that defendants had been negligent in exposing his impounded cattle to disease and increased impoundment costs. Negligence claims are not cognizable in an APA action. Judge Viken did not strike or dismiss plaintiff's references to negligence, finding that such references were in the nature of inartful pleading.

18

In the second amended complaint, plaintiff seeks, *inter alia*, a money judgment for the value of the cattle impounded. Judge Viken noted that claims for money damages are not cognizable in an APA action. However, Judge Viken held that plaintiff is merely seeking recovery of moneys paid to redeem his cattle in the form of a refund. Judge Viken did not dismiss plaintiff's prayer for money damages.

Defendants twice asserted that the United States or the Department of the Interior should be substituted for the individual federal defendants who were all sued in their official capacities. In response, plaintiff sought to amend his complaint yet again to assert personal capacity claims. Judge Viken denied plaintiff's request to amend his complaint yet again but did not foreclose the possibility after the IBIA issued its decision.

## CONCLUSIONS OF LAW

I take judicial notice of and adopt the conclusions of law previously entered by Judge Viken, with the exception of the decision to stay plaintiff's claims regarding the monetary assessments pending determination by the IBIA as to the exhaustion issue.

**I. Jurisdiction.**

### A. Pre-impoundment Claims.

Judge Viken held, in his February 19, 2016,opinion and in his September 30, 2019, opinion that this Court does not have jurisdiction to adjudicate plaintiff's pre-impoundment claims relating to the allocation of tribal grazing permits. *Id.* at 615-616. All such claims were dismissed from this suit.

### B. Exhaustion.

#### 1. Financial Assessments.

It is a well-established doctrine that federal administrative remedies which are prescribed by the Department of Interior must be exhausted before a party may seek judicial relief. Chase v. Andeavor Logistics, L.P., 12 F.4th 864, 868 (8th Cir. 2021). *See also*, Grondal v. United States, 37 F.4th 610, 619 (9th Cir. 2022) (exhaustion required pursuant to 25 C.F.R. § 2.4). The defendants contended in their motions to dismiss that that this Court did not have subject matter jurisdiction to resolve plaintiff's claims challenging the BIA's assessment of penalties, costs, and damage calculations because

plaintiff did not exhaust his administrative remedies. Judge Viken initially held that plaintiff was required to exhaust those remedies through administrative appeal. Temple v. Her Many Horses, 163 F.Supp.3d at 616. However, in his September 30, 2019, opinion, Judge Viken deferred to the IBIA to determine whether plaintiff's notices of appeal of the preliminary assessments was sufficient exhaustion. Temple v. Roberts, 2019 WL 477392, at *5.

During the pendency of this litigation, plaintiff appealed the preliminary decisions of the Superintendent of the Pine Ridge Agency as to each of the impoundments to the Great Plains Regional Director. The Superintendent of the Pine Ridge Agency determined that the findings of trespass and subsequent impoundments were proper but that any appeal of the amount demanded to redeem the cattle was premature until the final assessment. The final assessment as to the first impoundment was issued by the Superintendent on September 28, 2016. The final assessment as to the second impoundment was issued by the Superintendent on January 3, 2017. In both of those notices, plaintiff was advised that he could appeal the final assessment to the Regional Director. There is no evidence that plaintiff ever did file an administrative appeal to the Regional Director as to the monetary assessments for the two impoundments. It is unclear whether he attempted to amend his appeals to the IBIA to include an appeal of the final monetary assessments.

The Department of Interior Bureau of Indian Affairs regulations are found at Title 25 of the Code of Federal Regulations ("CFR"). Pursuant to 25 CFR § 2.6(a) (2016), "[n]o decision, which at the time of its rendition is subject to appeal . . . shall be considered final so as to constitute Departmental action subject to judicial review under 5 U.S.C. 704" unless "public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately." The regulations concerning grazing permits are set forth at 25 CFR Part 166. Pursuant to 25 CFR § 166.3, appeals from decisions of the BIA under Part 166 are taken pursuant to 25 CFR part 2. Trespass determinations and final financial assessments for trespass must be administratively appealed to authorize judicial review under the APA.

20

Plaintiff was specifically advised by the Regional Director in response to plaintiff's appeal of the trespass determinations and impoundment actions that his appeal of the monetary assessments was premature. He was specifically advised by the Superintendent in the final notice of assessing monetary penalties that such final notice was appealable to the Regional Director. The regulations require exhaustion by appeal to the Regional Director and plaintiff was aware that he could so appeal. His claims regarding the assessment of penalties are dismissed.

### 2. Impoundment.

The record is clear in this case that plaintiff did appeal the findings made by the Superintendent of the Pine Ridge Agency that plaintiff's cattle were grazing in trespass and the subsequent impoundments and sales. The Regional Director of the Great Plains Region reviewed the Superintendent's decision and held that plaintiff's cattle were in fact trespassing, that impoundment was proper, and that his decision on those matters was a final agency action.

On September 30, 2019, Judge Viken issued an order on the motion to dismiss the second amended complaint filed in this action. Temple v. Roberts, 2019 WL 4773929. Judge Viken noted that he had previously ruled that plaintiff's "'Fifth Amendment due process claims relating to the impoundment of his cattle' and his 'APA claim stemming from the impoundment' were exempt from the exhaustion requirement." Temple v. Roberts, 2019 WL 4773929, at *2. Judge Viken held that, since the plaintiff elected "to proceed with the administrative appeal process, the court finds it is appropriate to stay consideration of the impoundment claims pending resolution of the IBIA appeals." Id.

Four years after this case was stayed by Judge Viken to allow the IBIA to resolve plaintiff's claims, the IBIA had still not issued any action on the plaintiff's appeals. I previously ruled, as had Judge Viken, that plaintiff was not required to exhaust the claims that remained in this case. If however, exhaustion was required, including appeal to the IBIA, I found that such exhaustion is futile. No federal agency should be allowed to interfere with the timely administration of federal court cases. The delay by the IBIA is arbitrary and capricious. As is often said, "justice delayed is justice denied."

21

The exhaustion doctrine allows the agency to develop facts that may be necessary to resolve the legal issues between the parties. However, the IBIA did not develop any facts and decide the appeal despite the passage of 8 years since plaintiff filed the first appeal from the first impoundment. As I previously held, further exhaustion, even if normally required, is entirely futile in this case. I have not heard of any such dilatory practices by any other court.

"Judicial review under the Administrative Procedures Act is ordinarily 'limited to the administrative record that was before the agency when it made its decision,' precluding a court from 'conducting a de novo trial and substituting its opinion for that of the agency.'" McClung v. Paul, 788 F.3d 822, 827 (8th Cir. 2015) (quoting Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 766 (8th Cir.2004)). The agency did not develop a factual record in this case. Plaintiff did not have a venue to present evidence and there has been no administrative review of the actions taken by the BIA in this case. Therefore, this Court conducted a bench trial to allow the parties to present facts necessary for a determination of the issues in this case.

## II. Sovereign Immunity.

Judge Viken held in his February 19, 2016, opinion that sovereign immunity does not bar plaintiff's claims under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, and his claims that his cattle were impounded in violation of his constitutional right to Due Process. Temple v. Her Many Horses, 163 F.Supp.3d at 617 – 620. Specifically, Judge Viken held that the district court had jurisdiction to review actions taken by defendants pursuant to the American Indian Agriculture Resource Management Act ("AIARMA"), 25 U.S.C. § 3701 et seq., and the regulations governing trespass issued thereunder as required by 25 U.S.C. § 3713. Temple v. Her Many Horses, 163 F.Supp.3d at 619. I join in that decision.

## III. Fifth Amendment Claim.

Plaintiff sought preliminary injunctive relief preventing the sale or disposition of his cattle on the basis that he had been denied an opportunity to contest the finding that his cattle were grazing in trespass and was denied a pre-deprivation hearing prior to

impoundment. Judge Viken analyzed the issue whether the BIA's impoundment regulations failed to provide Due Process and found that "Mr. Temple failed to demonstrate he is likely to succeed on the merits of his Fifth Amendment due process claim relating to the BIA's impoundment regulations." Temple v. Her Many Horses, 163 F. Supp. 3d at 625. That finding was preliminary and this Court will further address plaintiff's Due Process claims. Judge Viken held, however, that the "BIA provided Mr. Temple with constitutionally adequate notice of the impoundment of his livestock." Id. at 626. That is the law of the case as to notice.

The APA mandates that the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Fifth Amendment to the United States Constitution provides no person shall "be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. Plaintiff's Fifth Amendment challenge is reviewable under the APA.

The United States Court of Appeals for the Eighth Circuit's decision in Jones v. Freeman, 400 F.2d 383 (8th Cir. 1968) is dispositive. That case concerned United States Department of Agriculture, Forest Service regulations as to trespassing livestock in National Forests found, at that time, in 36 C.F.R. § 261 et seq. The regulations concerning trespassing livestock provided for notice of trespass and direction to remove trespassing animals along with a warning that trespassing animals may be impounded, and provisions for the sale of or redemption of the impounded animals. Jones v. Freeman, 270 F.Sup.. 989, 992 (W.D. Ark. 1967). The case arose "out of the efforts of the United States Forest Service to keep razorback hogs from foraging in the Ozark National Forest." Jones v. Freeman, 400 F.2d at 385.

The Eighth Circuit held in Jones v. Freeman, inter alia, that the agency actions in impounding and assessing expenses taken pursuant to the Forest Service regulations are judicially reviewable. Jones v. Freeman, 400 F.2d at 390. "Since, incident to judicial review, the plaintiffs will be entitled to a trial de novo if there is no administrative hearing,

we need not consider whether the failure to provide an administrative hearing is a denial of due process." *Id.*

In McVay v. United States, 481 F.2d 615 (5th Cir. 1973), the United States Court of Appeals for the Fifth Circuit cited the Eighth Circuit's opinion. That case concerned the same Forest Service regulations as to trespassing livestock in National Forests found, at that time, in 36 C.F.R. § 261 *et seq.*

> Defendant McVay was notified on August 2, 1972 by the Forest Supervisor for the Kisatchie National Forest in Louisiana that his cattle had been observed on National Forest land without authorization or permit, and he was informed that he had until August 11 to remove them or they would be impounded. On August 22, the Forest Service, acting under authority of the regulation, 36 C.F.R. § 261.13(a), impounded nine of McVay's cows which were found on National Forest land. Though given an opportunity to do so, including a conference with McVay's attorney relative to redemption of the impounded cattle upon payment of the Government's expenses, appellant did not redeem his cows. On August 24, a notice was published in the Alexandria, Louisiana, daily newspaper to the effect that on August 29 the impounded cows would be auctioned at public sale. McVay then filed the instant suit on August 25 for injunctive relief, alleging that the regulation under which the cattle had been impounded was unconstitutional, in violation of the Fifth Amendment, because it allegedly did not provide for notice and a hearing prior to impoundment or for an opportunity to contest the validity of the expenses incurred. A hearing was held by the district court on August 31 and its ruling was made on September 1, 1972, denying the requested injunction. In the meanwhile, the sale scheduled for August 29 had been cancelled because of pendency of the suit and the notice was republished for the public auction to be held on September 5, 1972.

The facts of McVay v. United States are strikingly similar to what occurred in this case.

> In the present case the applicable regulations promulgated by the Secretary of Agriculture provide for notice by registered mail to the owner of the livestock found trespassing on National Forests, the owner being given five days after date of the written notice of the trespass to remove his cattle or impoundment would follow. 36 C.F.R. § 261.13(a). Upon impoundment of the livestock no sale shall be made until at least five days have elapsed and the owner may redeem his livestock within that period by submitting proof of ownership and paying the Government's expenses. 36 C.F.R. § 261.13(d). Thereafter, if the livestock are not redeemed within the date fixed for their sale, they shall be sold at public auction to the highest bidder. 36 C.F.R. § 261.13(e). It appears that McVay had ample time from the date he was first notified on August 2, 1972, until September 5, 1972, when the public auction occurred, to redeem his cows but that he failed to do so.

24

* * *

The Secretary of Agriculture is authorized by Congress to make such rules and regulations as are necessary to prevent trespassers and otherwise regulate the use and occupancy of property in the public domain, including the National Forests. *See* 7 U.S.C. §§ 1010, 1011(f); 16 U.S.C. § 551. The Eighth Circuit has had occasion to consider the question involved and has upheld the constitutionality of the regulation, including the remedy of impoundment. *See Jones v. Freeman*, 8 Cir., 1968, 400 F.2d 383, 388-389.

McVay v. United States, 481 F.2d at 616–17.

The United States Court of Appeals for the Ninth Circuit's decision in Klump v. Babbitt, 108 F.3d 1385, 1997 WL 121193 (9th Cir. 1997), concerning similar provisions in the Bureau of Land Management regulations is instructive.

Although the fundamental requirement of due process is notice and opportunity to be heard, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), a predeprivation hearing is not required in all circumstances. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). The process that is required in a particular context depends on a balancing of the following factors: (1) the importance of the private interest and the length or finality of the deprivation; (2) the likelihood of government error; and (3) the magnitude of the governmental interest. *Id.*

Although Klump's interest in maintaining his property rights to the impounded cattle is substantial, especially because cattle are potential income-generating animals, *Porter v. Diblasio*, 93 F.3d 301, 306 (7th Cir.1996), the risk of governmental error is relatively low. The regulations require the BLM to give the owner of the unauthorized livestock several notices prior to impounding the offending livestock, including a trespass notice and order of removal, and a notice of intent to impound. *See* 43 C.F.R. §§ 4150.2, 4150.4–1. In addition, the trespass notice gives the alleged violator a[n] opportunity to present evidence that there is no violation. *See* 43 C.F.R. § 4150.2. Once the livestock is impounded, the regulations allow the owner to redeem the livestock at any time before they are sold at public auction. *See* 43 C.F.R. § 4150.4–4.

Moreover, the government has a substantial interest in preserving the integrity of the public land. *See Utah Power & Light Co.*, 243 U.S. 389, 404–05 (1917); *see also Nevada v. Watkins*, 914 F.2d 1545, 1552–53 (9th Cir.1990). Because the government has a substantial interest in protecting the public land, and the regulations require notice and an opportunity to demonstrate that the livestock is (sic) not in trespass before it (sic) is impounded, we agree with the district court

25

that the BLM impoundment regulations do not violate Klump's Fifth Amendment right to due process. *See Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1323–24 (9th Cir.1982) (due process clause does not entitle the owners of towed vehicles to an immediate hearing).

Klump v. Babbitt, 1997 WL 121193, at *2.

Klump v. Babbitt concerned the United States Department of Interior Bureau of Land Management ("BLM") unauthorized grazing regulations at 43 CFR § 4150 *et seq*. Those regulations referred to "unauthorized grazing" instead of using the term "trespass." However, the BLM regulations at issue in Klump v. Babbitt mirror the notice and order to remove, impoundment, and sale or disposal provisions in the BIA regulations at issue in this case.

Although Klump v. Babbit was unpublished, the Ninth Circuit cited that case as controlling in Yowell v. Abbey, 532 F. App'x 708, 710 (9th Cir. 2013), for the rule that "the BLM was not required to provide a pre-deprivation hearing" as to BLM impoundment proceedings.

I find that the BIA's actions in providing notices of trespass, impoundments, sale of plaintiff's livestock, and assessments of penalties which were taken in this case pursuant to the BIA's trespass regulations did not violate plaintiff's right to due process. Plaintiff has cited no case law to the contrary.

Plaintiff failed to take advantage of the many opportunities provided in the notices to cure the trespass or give sufficient written notice of a legal right to graze the range units in question. He failed to take advantage of the right to redeem the cattle impounded in August 2015. He caused significant delays and interfered with the BIA's attempts to sell the cattle.

Plaintiff filed appeals to the IBIA after Judge Viken ruled that further exhaustion was not required. He filed a motion to stay this case pending the criminal proceedings against him. He sought and received many extensions as to filings in this case. He ultimately received a trial in this case as to the impoundments and sale.

Plaintiff claims in his trial brief that he was denied due process when the BIA instituted trespass proceedings against him while he was still litigating in Oglala Sioux

Tribal Court his right to the grazing leases for the range units in question. The BIA was not required to allow plaintiff to continue to graze in trespass, depriving the owner of the grazing permit of lawful use of the grazing permits, overgrazing and causing damage to the range units, all while paying no rent for the unlawful use of the grazing units. Plaintiff was acting as nothing but a holdover tenant and the BIA was legally authorized to institute trespass proceedings to protect the trust lands.

Plaintiff also contends that his right to due process was violated when the BIA impounded cattle that were grazing on his own property. Any property to which plaintiff had any ownership interest which was contained in Range Units 169 and P501 was, along with all other property owned by the Ogalala Sioux Tribe or its members, administered by the BIA as one range unit and leased under one lease per range unit. Until plaintiff complied with the requirements for removing property in which he had a whole or fractional share from the range units, plaintiff had no grazing rights to that property. He only had the right to receive his portion of the rental payments (which he caused to be zero). Further, plaintiff was prohibited from grazing his cattle on any land that was not fenced so as to prevent the cattle from trespassing on land managed by the BIA pursuant to its trust responsibilities.

In any event, the evidence at trial showed that the BIA was careful not to count cattle that were trespassing on parcels in which plaintiff had an ownership interest. No cattle were rounded up and impounded that were, at the time of impoundment, grazing plaintiff's parcels. The BIA used sophisticated GPS devices to determine on what parcel any particular animal was grazing. There is no evidence to support plaintiff's claims in this regard.

**IV. Agency Discretion.**

Judge Viken considered plaintiff's claim that the impoundment of his livestock was arbitrary and capricious in violation of the APA. Judge Viken held that plaintiff did not show that the impoundment actions were "willful and unreasoning or unsupported by a rational basis." *Id.* at 627. I will revisit that issue based upon the additional evidence received in this case since 2016.

27

## A. Finding of Trespass.

Under the Administrative Procedure Act, this Court must determine whether the BIA's findings that plaintiff was grazing his cattle in trespass was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Red River Valley Sugarbeet Growers Ass'n v. Regan, 85 F.4th 881, 886 (8th Cir. 2023) (citing 5 U.S.C. § 706(2)(A)). This analysis does not require extensive inquiry in this case.

Pursuant to 25 C.F.R. § 166.800, trespass is defined as "any unauthorized occupancy, use of, or action on Indian agricultural lands." The trespass provisions specifically apply to Indian trust land managed under a permit. Id. The record is replete with evidence that defendant was an unauthorized holdover tenant who repeatedly refused to remove his cattle from Range Units 169 and P501 upon the expiration of his lease in 2012.

Plaintiff's repeated claim that he was in fact entitled to the 2012 grazing permit is unassailing. He was not entitled to violate the law of trespass based upon his claim that the Oglala Sioux Tribe unfairly awarded the grazing permits to some other rancher. His remedy was to remove his cattle while seeking review of that decision. He refused to do that.

I further reject plaintiff's claim that he was entitled to graze his cattle on his own land within the range units. He was not entitled to do so while the parcels in which he had an interest were included in range units which were managed by the BIA as part of its trust responsibility to all the owners of acres in the range units. His remedy was to remove his cattle from the range units upon expiration of the leases while taking steps to remove the acres in which he had at least a 50% interest from the BIA's grazing program. Plaintiff eventually did remove land in which he had a sufficient interest from the range units at issue in this case. Nonetheless, he still cannot graze his cattle on those parcels until he erects fences preventing his cattle from grazing on land which remains in the range units managed by the BIA.

The BIA's findings that plaintiff was grazing his cattle in trespass was not arbitrary or capricious or an abuse of discretion and such findings were in accordance with the trespass regulations at 25 C.F.R. Part 166.

**B. Impoundment.**

Pursuant to 25 C.F.R. § 166.803 (2012 – 2016 regulations are all consistent), the BIA was required to give plaintiff written notice of the alleged trespass including:

(1) The basis for the trespass determination;
(2) A legal description of where the trespass occurred;
(3) A verification of ownership of unauthorized property (e.g., brands in the State Brand Book for cases of livestock trespass, if applicable);
(4) Corrective actions that must be taken;
(5) Time frames for taking the corrective actions;
(6) Potential consequences and penalties for failure to take corrective action; and
(7) A statement that unauthorized livestock or other property may not be removed o disposed of unless authorized by us.

The trespass notifications given to plaintiff all complied with the regulations and were not in violation of any of plaintiff's rights.

Pursuant to 25 C.F.R. § 166.804, upon receipt of a trespass notice, plaintiff was required to "(a) comply with the ordered corrective actions; or (b) contact us [the BIA] in writing to explain why the trespass notice is in error." The record is clear that plaintiff did not remove his cattle from Range Units 169 and P501 nor did he give any written notice, let alone sufficient notice that the trespass notices were in error.

When plaintiff did not cure the notices of trespass, the BIA was authorized by 25 C.F.R. §§ 166.806 *et seq.* to impound the trespassing cattle; assess damages for the value of the products illegally removed (eaten by plaintiff's cattle) plus a penalty of double that value and assess costs associated with damage to the land, costs associated with enforcement (field compliance checks, field damage surveys, etc.); give the trespasser notice of the right to redeem the impounded cattle upon payment of the foregoing monetary assessments; and to sell or dispose of the impounded cattle if the trespasser fails to redeem. The record is clear that the BIA's actions with regard to impoundment and sale of plaintiff's trespassing cattle were not arbitrary, capricious, or an abuse of

29

discretion, were authorized by federal regulations, were conducted in compliance with the law, and were warranted by the facts of this case. 5 U.S.C. § 706(2).

After an extensive review of the record and consideration of the evidence received during the evidentiary hearing conducted herein, the Court can find no evidence that the BIA acted in violation of any law or regulation. Plaintiff was not the permittee on the range units in question. He had no legal right to graze his cattle on Range Units 169 or P501 without prior removal from the grazing program and fencing. Upon notice of trespass, plaintiff failed to cure the trespass. Plaintiff produced no evidence that he had a legal right to graze his cattle on the range units or that he gave written notice to the BIA of a valid legal claim to graze his cattle on the range units.

Plaintiff contends that the BIA did not act reasonably in delaying the sale of his cattle, resulting in receipt of a sale price far below the fair value of the cattle. Plaintiff alleged unreasonable BIA delay in sale in each of his complaints. However, the record is clear that any delay in sale of the impounded cattle was caused solely by plaintiff. He filed the instant federal suit, along with a request for a temporary restraining order, soon after the first impoundment. Doing so delayed the sale of the cattle seized in the August 21, 2015, impoundment until U.S. District Judge Jeffrey Viken issued an order denying the restraining order and allowing the BIA to proceed with the sale. Plaintiff further delayed the sale by his conduct in threatening to sue the designated sale barns, causing those businesses to decline to follow through with the sales.

Plaintiff claims that the BIA's 2015 impoundment and subsequent holding of his cattle in Nebraska resulted in the infection of his cattle with Trichomoniasis, a contagious disease. Plaintiff adduced no evidence that any action of the BIA resulted in the infection of his impounded cattle. There was no evidence that any cattle in either of the Nebraska locations had tested positive for Trichomoniasis prior to the arrival of plaintiff's cattle. Instead, the record shows that the owner of Johnson Ranch, his neighbors, and the Nebraska Department of Agriculture were all very anxious to be rid of plaintiff's cattle so the disease did not spread to Nebraska cattle. Further, the record shows that cattle in plaintiff's herd that were not impounded but continued to graze in trespass after the first

30

impoundment were also infected. The record shows that the Trichomoniasis infection of plaintiff's cattle was not caused by any action on the part of the BIA.

Although I have held that plaintiff failed to exhaust his administrative remedies as to the monetary assessments, I find that such assessments were not arbitrary or capricious and were made in conformity with the trespass regulations. The assessments were based upon extensive records, taking into account the particular parcels grazed, the number of cattle grazing in trespass, and exacting review of the damage to the forage on the individual parcels in each affected range unit. At no time since the first impoundment and initial monetary assessment of the amount required to redeem the cattle did plaintiff raise any challenge, let alone a credible challenge, to the BIA's assessments. Instead, plaintiff's challenge to the monetary assessments was simply that he was allowed to graze his cattle on the range units in question, that he was therefore not grazing his cattle in trespass, and therefore was not legally required to pay anything for the return of his cattle.

The Eighth Circuit has instructed:

> When reviewing an agency's action we are to make a searching inquiry into the facts, examining the full administrative record, but we do not substitute our judgment for that of the agency. We must ask whether the agency articulated a rational connection between the facts found and the choice made. The agency's determination will be upheld if it is supportable on any rational basis.

County of Charles Mix v. U.S. Dep't of Interior, 674 F.3d 898, 903 (8th Cir. 2012) (cleaned up) (internal quotations and citations omitted). I find that the BIA, with particularity, articulated a rational connect between the facts in this case and the decisions to issue notices of trespass, impoundment, and the monetary assessments.

## ORDER

Based upon the extensive record,

IT IS ORDERED, ADJUDGED and DECREED that judgment is entered in favor of defendants and against plaintiff.

IT IS FURTHE ORDERED that plaintiff's second amended complaint is dismissed on the merits and with prejudice.

31

IT IS FURTHE ORDERED that costs authorized by law are awarded to the defendants in the amount of $_____$, to be determined by the Clerk of Courts.

DATED this 8ᵗʰ day of December, 2023.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge